JOSEPH A. HARRAH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ROBERT E. HARRAH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 64479, 64480. Filed September 19, 1958.

*Cyrus B. King, Esq.*, for the petitioners.
*Aaron S. Resnik, Esq.*, and *Leslie T. Jones, Jr., Esq.*, for the respondent.

TIETJENS, *Judge:* These proceedings involve deficiencies in income and excess profits tax determined due from petitioners as transferees of Harrah Bros., Inc., for the taxable periods set forth below.

| Fiscal year ended | Tax | Deficiency |
|---|---|---|
| Mar. 31, 1952 | Income | $8,606.43 |
| Nov. 20, 1952 | Income and excess profits | 22,452.12 |

While conceding their liability as transferees, petitioners contest the deficiencies determined against their transferor by the Commissioner.

The issues are: (1) Whether a sawmill constructed by Harrah Bros., Inc., constituted property used in its trade or business within the meaning of section 117 (j) of the 1939 Code, so that the gain realized on its sale under a lease-option agreement was taxable at capital gain rates; and (2) whether the amounts received under the agreement,

which were subsequently allowed as credits on the purchase price, were rentals taxable in the year of their receipt, or were part of the purchase price taxable in the year when the option to purchase was exercised.

### FINDINGS OF FACT.

Joseph A. and Robert E. Harrah (hereinafter referred to as petitioners) are transferees of Harrah Bros., Inc., a dissolved corporation, each having received from that corporation assets in excess of the amount of the deficiencies in tax determined against it by the Commissioner.

Harrah Bros., Inc. (hereinafter referred to as the corporation) maintained its principal place of business at Willits, California, during the years in issue. It filed its Federal income tax return for the fiscal year ended March 31, 1952, with the former collector of internal revenue for the first district of California. Its return for the taxable period ended November 30, 1952, was filed with the director of internal revenue for the first district of California.

In 1943 petitioners formed a copartnership known as the Harrah Brothers Machine Works which engaged in the operation of a repair shop. The business subsequently expanded to include the construction of sawmill equipment and machinery and the design and manufacture of complete sawmill plants.

In April 1951 petitioners organized Harrah Bros., Inc., which succeeded to the business then being carried on by the partnership. Its articles of incorporation provided that it was organized to "manufacture machinery, repair, install and build mills and machinery of all kinds, operate and sell lumber mills and machinery."

In the ordinary course of business, when either the corporation or its predecessor built complete sawmills they did so on the order and specification of individual purchasers. In some instances the machinery was built and shipped to the customer for construction of the mill; in others, the construction work was done by the corporation or its predecessor.

In addition to the above-mentioned activities, the corporation and its predecessor engaged in experimental work. That work resulted in the development of a considerable amount of automatic sawmill equipment, and in the construction of the first all air-operated mill on the Pacific coast.

In late 1950 or early 1951 experimental work was commenced on a portable sawmill. Numerous inquiries had been received concerning that type mill, and it was hoped that one could be efficiently built and operated. At the outset the corporation intended to experiment with the portable mill to determine the efficiency and economy of its operations. If the experiment proved a success it intended to build other

portable mills and sell them. The immediate goal, however, was the construction of a mill which could be economically operated by few workmen; could be moved rapidly from one location to another; could be profitably operated for the manufacture of only a million or so feet of timber; and could be set up in less time and at less expense than the standard fixed mill.

While the mill was still in its preliminary planning and construction stage, the Harrah brothers discussed certain proposals with respect to its ultimate operation. The corporation attempted to negotiate an agreement with a lumber manufacturing firm under which the mill could be tested. Those negotiations were terminated, and others begun relative to the lease of certain land in Willits upon which the mill could be set up and tried out on logs purchased from the owners of small tracts of timberlands.

In either July or August of 1951, Mal Coombs (hereinafter referred to as Coombs) came into the corporation's shop to look at the mill. He had heard that one was under construction and was interested in its function. At that time the mill was approximately 70 per cent complete. Some 2 weeks to a month later, Coombs returned, indicating that he was interested in buying the mill. Petitioners responded that they did not wish to sell the mill at that time because it was untried and further that they did not know how much they had expended on it nor the price which it would bring on the market. However, they indicated that they expected to test it on certain lands in Willits and if the tests proved successful they would build a mill for Coombs. Coombs then suggested that the mill might be set up on his property instead of at Willits in order that he might lease it.

Further meetings were held and after securing Coombs' consent to make an initial payment of $15,000 to the corporation and deed to it certain real property, it was agreed that the mill would be made available to him for his operation at a rental to be based on the number of board feet produced. The parties then went before petitioners' attorneys who drafted a proposed lease-option agreement to effectuate their desires, which was executed on October 12, 1951.

The agreement provided that Harrah Bros., Inc., lease the mill to Coombs for a period of 1 year after the date of its completion for a total rental of $39,000, and further provided:

Said rental shall be paid as follows: $15,000.00 upon the execution of this agreement * * *; the further sum of $4.00 per thousand board feet of lumber produced in said mill, or a minimum monthly payment of $2,000.00, whichever is greater * * *

If the Lessee at time of exercise of option is not then in default in the payment of rent hereunder as hereinabove provided, then the Lessor hereby gives and grants to the Lessee the right and option to purchase said real property and said sawmill thereon for the total sum of $75,000.00 in lawful money of the United

States. Said $75,000.00 shall be payable at the rate of $4.00 per thousand board feet of lumber produced in said mill monthly, with a minimum payment of not less than $2,000.00 monthly, whichever is greater * * *

*     *     *     *     *     *     *

If any sum in excess of $39,000.00 be paid by the Lessee to the Lessor during the one year term of this lease, such excess will either be refunded by the Lessor to the Lessee, or applied toward the purchase price in the event that Lessee exercises the right of option to purchase said property.

If said option be exercised by Lessee, the $15,000.00 payment hereinabove provided for plus $2.00 per thousand board feet of lumber produced paid during the term of said lease shall be a credit on the total purchase price of $75,000.00.

Incident to the above agreement, Coombs deeded to the corporation the property upon which the mill was to be constructed. It was agreed that the land would be deeded back when all obligations under the agreement were met. The $15,000 payment provided for was paid by Coombs in two equal installments of $7,500 on September 30, 1951, and on October 31, 1951. Between January 9 and March 2 of 1952 the mill was erected on the agreed location. During the period extending from April 1, 1952, to November 25, 1952, Coombs paid the sums of $24,000 rental and $5,150.63 excess rental pursuant to the terms of the agreement. It had been expected that the mill would cut approximately 30,000 feet of lumber per day; however, it actually cut twice that amount. Coombs determined that rather than continue paying rent it would be more economical to purchase the mill. Accordingly, on November 25, 1952, he exercised the option to purchase. At that time, there was a principal balance of $42,849.37 due under the agreement.

On November 30, 1952, the corporation was dissolved. The lease-option agreement was distributed to petitioner Joseph A. Harrah. The other assets of the corporation were distributed to petitioner Robert E. Harrah.

The corporation did not report the receipt of the $15,000 provided for by the agreement in its tax return for its fiscal year ended March 31, 1952. In its return for the period April 1, 1952, to November 30, 1952, the corporation reported $12,000 of the $29,150.63, paid to it under the agreement, as rental income. The balance along with the $15,000 was treated as part of the $75,000 purchase price, which was returned as the gross sales price received from the sale of a capital asset held for more than 6 months. The corporation claimed depreciation on the mill for the taxable period.

The Commissioner determined that the mill was an asset held primarily for sale to customers in the ordinary course of business, and that the gain realized on its sale was taxable as ordinary income. He disallowed the deductions taken by the corporation for depreciation on the ground that it "contracted to sell the sawmill under a condi-

tional sales contract." He further determined that the sums of $15,000 paid to the corporation in its fiscal year ended March 31, 1952, and $29,150.63 paid to it during its taxable period ended November 30, 1952, were rental payments taxable as ordinary income in the year of their receipt.

The mill sold by Harrah Bros., Inc., to Coombs during the taxable period ended November 30, 1952, was, at the time of sale, property held for sale to customers in the ordinary course of its business, and the gain from the sale thereof was taxable as ordinary income.

The $15,000 initial payment made by Coombs during the taxable period ended March 31, 1952, was primarily a prepayment of rent.

OPINION.

The principal issue is whether Harrah Bros., Inc., realized ordinary income or a capital gain on the sale of its experimental sawmill. A subsidiary issue is whether the sums of $15,000 and $17,150.63 paid under the lease-option agreement constituted rentals taxable in the year of their receipt, or part of the purchase price taxable in the year of the exercise of the option.

Petitioners' position is that the mill constituted property used by the corporation in its trade or business within the meaning of section 117 (j) of the 1939 Internal Revenue Code,[1] and the gain on its sale was properly treated as a capital gain. They maintain that it was held separately and distinct from other mills built and sold by the corporation, inasmuch as it was constructed as an experiment on the corporation's own initiative, and was intended to be operated by the corporation alone. They contend that the corporation had no intention of selling the mill to Coombs, or anyone else for that matter, and that the sale took place simply because Coombs determined it would be more economical to exercise the option to purchase rather than continue the payment of rent. They further maintain that the sum of $15,000 paid the corporation during its fiscal year ended March 31, 1952, represented security for performance of the lease, which, in the event the option was exercised, was to be applied to the purchase price.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation * * * held for more than 6 months * * * which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

(2) GENERAL RULE.—If * * * the recognized gains upon sale * * * of property used in the trade or business * * * exceed the recognized losses from such sales * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

They therefore conclude that it was part of the purchase price taxable as a capital gain in the year of exercise of the option. Lastly, they contend that since $17,150.63 of the amount paid during the taxable period ended November 30, 1952, was credited against the purchase price, it too was taxable as a part thereof at capital gain rates. For the reasons set forth below we do not agree.

Property used in a taxpayer's trade or business is specifically exempted from the benefits of section 117 (j) if it is held primarily for sale to customers in the ordinary course of that trade or business. *Primarily* has been held to mean *substantially* or *essentially* rather than *principally*. *Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263 (C. A. 9, 1951), affirming a Memorandum Opinion of this Court dated July 17, 1950. While the underlying purpose of the original acquisition of property is to be given consideration, it is clear that such purpose may change over a given period of time. Where this has been the case, the original purpose necessarily must give way to the purpose for which the property is held at the time of its sale. *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C. A. 10, 1952), affirming 16 T. C. 698 (1951). Whether, at the critical date, the property is held for sale is a question of fact. *Duval Motor Co.*, 28 T. C. 42 (1957) ; *Johnson-McReynolds Chevrolet Corporation*, 27 T. C. 300 (1956).

Property may be held for more than one purpose, and that, we are of the opinion, was the case here. Concededly, the corporation was conducting an experiment when it undertook the construction of the mill. At that time it had no way of knowing whether it would be a success or a failure. Even when first approached by Coombs, no definite plans had been formulated, and his initial offer to purchase was refused because petitioners did not know the mill's capabilities or its relative worth on the market. However, upon execution of the lease-option agreement a second purpose for holding the property arose, namely, its sale. The option to purchase constituted a continuing offer on the part of the corporation to sell the property. From that moment on that property was held for sale in the ordinary course of the corporation's business.

In this respect the instant case is not unlike that of *Rollingwood Corp.* v. *Commissioner*, *supra*, wherein the taxpayer rented some 700 houses with an option to the tenant to purchase. In affirming our decision that those houses were held for sale in the ordinary course of the taxpayer's business, the Court of Appeals stated:

Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that is, if the *rental market* were good he would continue to rent but if the *sales market* were high he would sell. In either of these

suppositions we think it is fair to say that one of the essential purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative *purpose* to allow him to treat the proceeds of these sales as a capital gain? We think not.

The capital gains provisions are remedial provisions. Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time from having the profits from sales taxed at graduated tax rates designed for a single year's income. * * * It is our view that this policy was not meant to apply to a situation where one of the essential purposes in holding the property is *sale.*

Applying that reasoning to the case before us, we are of the opinion that petitioners intended to operate the mill experimentally for as long as it took to determine its worth, and then that they intended to sell it. This dual intention persisted until the exercise of the option by Coombs, which was when the instant sale took place. We conclude, and have found as a fact, that at the time of its sale the mill constituted property held for sale to customers in the ordinary course of the corporation's business, and that the gain realized thereon was taxable as ordinary income.

Petitioners' argument that the record overwhelmingly establishes that neither the corporation nor Coombs intended to effectuate a sale of the mill prior to the exercise of the option, completely ignores the agreement. If no intention to sell existed, we do not understand why it was found necessary to grant the lessee an option to purchase. Petitioners have offered no explanation, and we believe the only logical one is that reached above, namely, that at the time the agreement was executed an ultimate sale was contemplated by the parties. Respondent is sustained on this issue.

The next issue is whether the initial payment of $15,000 made by Coombs during the corporation's fiscal year ended March 31, 1952, which was credited on the purchase price pursuant to the terms of the agreement, constituted rent taxable in the year of its receipt, or part of the purchase price taxable in the year the option was exercised. Since we have concluded that the gain realized on the sale was ordinary income, the payments made during the corporation's taxable period ended November 30, 1952, are similarly taxable whether designated rent or purchase price.

On brief, respondent suggests this issue becomes moot in the event we hold the gain on the sale to be ordinary income "[s]ince the taxpayer is a corporation, [and] there is no problem of any difference in rates arising out of a lumping of the income in one year." Be that as it may, respondent has overlooked the fact that the due date of a tax, predicated on the year in which income is received, is essential in fixing the running of interest, which section 311 (a) (1) of the 1939

Code [2] specifically provides is includible in a transferee's liability if owing by his transferor. Since the resolution of this issue will determine the year in which an item of income was to be reported by the transferor, we are of the opinion that this issue is not moot.

Petitioners contend that the primary purpose of the $15,000 payment was to serve as security for the performance of the lease, with the understanding that it would be credited on the purchase price if the option was exercised. They concede the agreement designated that amount was to be paid as rent, but maintain that it is ambiguous since it provides that the $15,000 was also to be credited on the purchase price. They therefore have introduced extrinsic evidence, in the form of the testimony of the parties which they maintain clearly supports their position.

Whether a payment is to be regarded as security for performance of a lease, advance rentals, or a part of the purchase price depends on the primary purpose for which it was made. *Gilken Corporation*, 10 T. C. 445 (1948), affd. 176 F. 2d 141 (C. A. 6, 1949). Thus the question resolves itself into one of fact.

A careful review of the entire record reveals the following salient facts. The agreement itself clearly and definitely characterized the $15,000 as rent. However, the agreement did not specifically provide for its return to Coombs in the event the option to purchase was not exercised. In point of fact, only those payments in excess of $39,000 were expressly to be returned in that event. Furthermore, when questioned with respect to whether Coombs could have secured return of the $15,000 in the event of faithful performance of the lease but failure to exercise the option, both petitioners expressed uncertainty. When asked if the $15,000 was to be returned in the event the option was not exercised, Robert Harrah replied:

A. * * * If he just said, "Well, I am all through with the saw mill," he would have got it back, *or he might have got it back.* [Emphasis supplied.]

In response to a similar question, Joseph Harrah answered:

A. That is something I have often wondered about, what we would have done at that time. I felt we would cross that bridge when we came to it.

In the light of those facts, and the record as a whole, we have concluded and have found as a fact that the amount in dispute was primarily a prepayment of rent. The fact that it was to be credited on the purchase price if the option was exercised does not detract from

[2] SEC. 311. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall * * * be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter * * *

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

what we believe was its principal function. *Gilken Corporation, supra; Estate of Clarence B. Eaton,* 10 T. C. 869 (1948) ; *Indian Creek Coal & Coke Co.,* 23 B. T. A. 950 (1931). In reaching that conclusion we have considered the extrinsic evidence offered by petitioners to substantiate their position, but do not believe it warrants a variance from the express provisions of the written agreement. It follows that the $15,000 was properly taxable in the year of its receipt. *New Capital Hotel, Inc.,* 28 T. C. 706 (1957).

Respondent's disallowance of the depreciation deductions taken by the corporation, solely on the ground the mill was sold under a conditional sales contract, represents an alternative position taken in the event petitioners were sustained on the principal issues. In the light of our conclusions set forth above, it follows that depreciation was properly claimed on the property during the taxable years.

*Decisions will be entered under Rule 50.*