RALPH H. AND CATHERINE PETERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78672.    Filed January 17, 1962.

*James A. Oliver, Esq.*, and *William J. Oliver, Esq.*, for the petitioners.

*Max J. Hamburger, Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1956 in the amount of $124,097.81. The only

issue for decision is whether the gain realized by petitioners on the sale of a silt bank was long-term capital gain as reported by them or ordinary income as determined by respondent.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, residing in Schuylkill Haven, Schuylkill County, Pennsylvania, filed a joint income tax return for the calendar year 1956 on a cash basis with the district director of internal revenue at Scranton, Pennsylvania.

Ralph Peters, hereinafter referred to as petitioner, has been engaged in the coal business for approximately 49 years. At the age of 13 he began working in a coalbreaker picking slate rocks. Thereafter he became a machinist and later the owner and operator of an anthracite coalbreaker. He has been engaged in anthracite coal operations as an individual proprietor, as a partner of a partnership, and as the executive officer of various corporate entities of which he owned a portion or all of the stock. In addition to operating coalbreakers, petitioner has also engaged in strip mining, selling of coal, and renting of equipment for strip mining. From sometime in 1935 until sometime in 1938, petitioner was engaged in the operation of a washery for processing fine coal. While the coal business has been petitioner's major business, he has also engaged in the business of farming and raising racehorses and drilling for natural gas.

Petitioner Catherine Peters is a housewife and she has no personal knowledge of the transactions here involved.

A coalbreaker is a preparation plant in which coal as it comes from the mine is processed to separate the rock and dirt from the coal and to sort the coal into the various commercially marketable sizes. Prior to January 27, 1947, the Mary D. Coal Mining Breaker (hereinafter referred to as the Mary D breaker) was owned and operated by entities in which petitioner had no interest. The Mary D breaker was built in October 1938. Prior to 1940 it had been the practice of the operators of the Mary D breaker to discharge the waste material from the breaker including silt and mud directly into the Schuylkill River by means of a long wooden trough leading from the breaker to the river. After the Pennsylvania Water Purification Act became effective sometime in 1940, the operators of the Mary D breaker installed pumps for the purpose of pumping the breaker water into a basin where the mud and silt settled and the clear water was then drained off into the river. The silt which was pumped into the basin resulted from the processing of the coal. Coal as it comes from a mine is mixed with impurities such as rock, slate, clay, and other materials. In a coalbreaker the coal is washed, large pieces of rock

and slate removed by hand, and it is then passed over wire screens which sort it into the various commercial sizes such as lump, broken, egg, stove, chestnut, pea, buckwheat, rice, and barley. Barley is the smallest size of coal above the level of silt or fine coal. Barley will not fall through a grill with a diameter of three sixty-fourths of an inch. Coal which will fall through such a grill is called silt and generally was not considered as commercially marketable coal by a breaker operator but was washed off with the impurities which were separated from the coal. In about 1955 or 1956 the major coalbreaker operators began to prepare silt or fine coal for commercial sale. As the slush water from the breaker is pumped into the basin, the silt pile which settles out of the water rises higher and in order to contain the area of the pile, it is dammed by a rim made of larger broken refuse and the silt water is discharged onto this dam. As a result of the day-by-day operations of the Mary D breaker a silt bank was formed.

On January 27, 1947, the Mary D breaker and the silt bank which had formed to that point was purchased by a corporation in which petitioner owned 50 percent of the stock. As of February 15, 1947, petitioner acquired complete ownership of the corporation which had purchased the Mary D breaker including the silt bank. The silt bank was not specifically mentioned in the deed transferring the breaker to the corporation in which petitioner owned an interest, nor was any determination as to its size made at that time. From February 15, 1947, through May 15, 1951, the Mary D breaker was operated at various times by the D. M. & K. Coal Company, Tuscarora Stripping and Mining Company, and the Mountain Top Coal Company, each of these operators being either a sole proprietorship of petitioner or a corporation, all of the stock of which he owned.

As of May 15, 1951, the Mary-D Stripping Company, a partnership composed of four individuals other than petitioner, but one of whom was petitioner's sister-in-law, operated the Mary D breaker as lessee. On December 15, 1951, an option was granted by the Mountain Top Coal Company (a corporation of which petitioner was the sole stockholder), the then owner of the Mary D breaker, to that partnership to purchase the breaker, which option was exercised by the Mary-D Mining Company, a partnership composed of the same individuals as the Mary-D Stripping Company, and by deed dated December 26, 1951, the Mountain Top Coal Company conveyed to the partnership the breaker and other incidental property. There was specifically excluded from the sale "all silt and/or refuse dumps or banks on the premises herein conveyed."

On February 14, 1952, the Mountain Top Coal Company executed a bill of sale conveying the silt bank to petitioner Catherine Peters, and, subsequently, when it was found that through inadvertence the

land underneath the silt bank had been conveyed to the partnership, the Mary-D Mining Company, this land was reconveyed by that partnership to Catherine Peters by deed dated June 2, 1953. Shortly after January 27, 1947, a washery plant for the recovery of fine coal was erected on the Mary D property by one Manbeck. The raw material used by the Manbeck plant was slush discharged from the Mary D breaker and no charge was made to Manbeck for his use of this breaker water. Manbeck removed approximately 75 percent of the coal contained in the refuse of the Mary D breaker while he was operating the washery plant during the years 1947 to 1951.

After the partnership, the Mary-D Mining Company, acquired the Mary D breaker, it continued to pump its silt onto the Mary D silt bank in accordance with arrangements made with petitioner under which petitioner granted this right to the Mary-D Mining Company partnership without charge, provided that he became the owner of the silt pumped onto the bank. This arrangement between petitioner and the Mary-D Mining Company partnership continued until the Mary D silt bank was sold by petitioners in 1956 to Integrity Coal Company, Inc.

As early as 1920 there was some use of silt as a commercial fuel. In that year 2.3 percent of all coal sold was silt size. Beginning in 1940 the value of silt as a commercially usable fuel became progressively more evident. Special plants were built to process silt banks, which banks were leased by the processors or purchased by them. By 1940 the percentage of silt sales to total coal sales of all sizes had risen to 4.3 percent, by 1945 it was 7 percent, and by 1950 it was 9.9 percent. Since 1950 public utilities have begun using silt in their operations and this has greatly increased the demand for silt. In 1955 silt constituted 17.9 percent of total shipments of all sizes of coal sold. During the years 1955, 1956, and 1957 the value of silt had increased as a result of a large export demand.

Generally, prior to 1955 or 1956, the persons engaged in the silt or fine coal business were not the same persons engaged in the operation of anthracite coalbreakers. The customers of persons engaged in the silt or fine coal business are different from those of the breaker operator and the equipment used for burning this fine coal is of a special type. The type of equipment used in separating fine coal or silt from impurities is different from that used in a coalbreaker for sorting the commercially marketable grades of coal of barley size or larger.

At sometime in 1948 or 1949 petitioner had acquired by purchase from the Reading Anthracite Company a silt bank located at Middleport, Pennsylvania. He acquired this bank for the purpose of removing therefrom the larger size coal which had previously been discarded. This bank contained about 20,000 tons of material and was purchased

by petitioner for $15,000. After extracting about $3,000 worth of material from this bank, petitioner discovered that the bank contained silt in such quantities as to make it not suitable to use the bank for the purpose for which he had purchased it. Petitioner sold this silt bank to Timothy J. Reilly for the unpaid balance on his original purchase price. This sale was made through a promoter named Jack Breslin. At sometime prior to April 2, 1951, the Coal Rain Coal Company, a corporation of which petitioner was at the time the sole stockholder, acquired by purchase a silt bank called the Lusanna Bank as a part of a larger purchase of a breaker, mine, and land. The breaker at this place burned and the ground was "diverted back" to the county in order to avoid the payment of taxes on it. Petitioner held the silt and sold the bank to Timothy J. Reilly in 1953 for $20,000. In 1947 the Coal Rain Coal Company, a corporation in which petitioner at that time owned 50 percent of the stock, leased a silt bank to Timothy J. Reilly. This silt bank had been produced as a result of breaker operations of the Coal Rain Coal Company. These two sales and one lease were the only transactions petitioner ever had in silt banks except for that connected with the Mary D silt bank.

On September 7, 1956, petitioners sold the Mary D silt bank and the land thereunder to Integrity Coal Company, Inc., for $200,000 payable $75,000 on the date of the transfer, $75,000 within 1 year from the date of the transfer, and $50,000 within 2 years from the date of the transfer. Sometime prior to the sale of the Mary D silt bank to Integrity Coal Company on September 7, 1956, petitioner was having breakfast with Timothy Reilly, and he and Reilly discussed the Mary D silt bank. Petitioner told Reilly that he would sell the silt bank if he could and asked Reilly whether he would be interested in leasing or purchasing the Mary D silt bank. Reilly said he might be interested if the quality of the bank was satisfactory to him. Reilly made tests of the bank and as a result of these tests concluded that he was not interested in leasing or purchasing the Mary D silt bank. At sometime prior to September 7, 1956, two men named Durkin and Connel asked petitioner if he would sell the Mary D silt bank and he told them he would. He granted an option to these two men to purchase the silt bank. Durkin and Connel paid petitioner $1,000 for a 60-day option, but they did not exercise the option. At sometime prior to September 7, 1956, Jack Breslin, the promoter, asked petitioner whether he would pay him a fee for selling the Mary D silt bank. Petitioner told him he would pay him if he sold the silt bank for $25,000. Breslin did not bring any prospective purchasers of the bank to petitioner.

The sale of the silt bank to Integrity Coal Company was made through a man named Jesse Hill who contacted petitioner and told

him he had a prospective buyer for the silt bank. Petitioner did not pay a sales commission to Jesse Hill.

Petitioners on their income tax return for 1956 reported a long-term capital gain on the sale of the Mary D silt bank of $73,880.71.

Respondent, in his notice of deficiency, determined that petitioner realized ordinary income in the amount of $198,880.71 from the sale of the Mary D silt bank with the following explanation:

(b) To pick up as ordinary income the profit on the sale of coal silt and/or coal refuse material, covering which sale the income was reported as a long-term capital gain and was treated as income from an installment sale. The property was held primarily for resale, therefore the gain should be considered ordinary income. Furthermore, the initial payment exceeded thirty percent, which fact precludes the treatment of the transaction as an installment sale.

Petitioners do not contest the determination that they are precluded from treating the transaction as an installment sale but do contend that the gain realized on the sale is long-term capital gain.

### OPINION.

Although the evidence shows that petitioner's wholly owned corporation transferred the Mary D silt bank to Catherine Peters, the parties have agreed that she, in fact, had no personal knowledge of the transactions and have considered the sale of the silt bank as being that of petitioner Ralph H. Peters. We will accept the view of the parties in this respect and consider that the silt bank was in effect transferred to petitioner Ralph H. Peters and sold by him.

Section 1221 of the Internal Revenue Code of 1954 [1] insofar as here pertinent, defines a capital asset as property held by a taxpayer but not including property held primarily for sale to customers in the ordinary course of his trade or business.

In the instant case the clear inference from the evidence is that when petitioner sold the Mary D breaker, he retained the Mary D silt bank with the idea of selling it if and when he could obtain what he would consider a fair price for it. Thereafter petitioner held this silt bank with the intent of selling it when a prospective buyer offered a price petitioner considered acceptable. A holding of property by a taxpayer with the intention of selling it when an acceptable price can be obtained is consistent with either an investment holding of

---

[1] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

the property for speculative purposes or a holding of it primarily for sale to customers in the ordinary course of a taxpayer's trade or business depending on the facts with respect to the transaction and the taxpayer's business activities. *Harriss* v. *Commissioner*, 143 F. 2d 279 (C.A. 2, 1944), affirming 44 B.T.A. 999 (1941); cf. *Joseph A. Harrah*, 30 T.C. 1236 (1958).

Whether property is held by a taxpayer for sale to customers in the ordinary course of his trade or business is a question of fact. As stated in *Kaltreider* v. *Commissioner*, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957), in the determination of this fact:

Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers.

The record shows that petitioner devoted very little time to his efforts to sell the Mary D silt bank and even though he authorized an agent to attempt to sell it, he never listed it with a broker who customarily handled the sale of such properties. The record also shows that petitioner had sold only two other silt banks and leased one during his entire career in the coal business prior to selling the Mary D silt bank. These transactions were spread over a period of approximately 10 years. One of the other sales was as a result of petitioner's having acquired a coal property which contained too high a quantity of silt to be satisfactorily usable by his coalbreaker and the other was made after the coalbreaker which it served had burned. Although petitioner had been engaged in various forms of the coal business, he was not a dealer in coal properties. Based on all the evidence we conclude that petitioner was not engaged in the business of selling silt banks or coal properties in 1956 when the Mary D silt bank was sold.

This leaves for consideration respondent's contention that the formation and sale of the Mary D silt bank was so closely related to petitioner's business of operating a coalbreaker that the gain on its sale should not be held to be capital gain. When the Mary D breaker was acquired by petitioner's wholly owned corporation the silt bank was a part of the property. The parties disagree as to the amount of silt which was on the bank at that time. Petitioner contends that almost all of the silt on the Mary D bank had been deposited prior to the time it was acquired by his corporation. He bases this on the fact that while his interests operated the bank about 75 percent of the silt was removed by a washing operation by another individual. Respondent contends that a much greater portion of the silt on the Mary D bank

resulted from petitioner's own operations. We have made no finding in this respect since we do not consider it material. Some of the silt was on the bank when it was acquired by petitioner's interests and some was deposited while the Mary D breaker was operated by petitioner's interests. While petitioner's interests were operating the Mary D breaker, the dam on which the silt was deposited was property used in petitioner's business. Respondent argues that the silt that accumulated during this time was a byproduct of petitioner's breaker operation and subsequently when the silt bank was sold, the gain upon the sale should be considered ordinary income because the acquisition, use, and accumulation of the silt bank was so closely geared to petitioner's coal business citing *Corn Products Co.* v. *Commissioner,* 350 U.S. 46 (1955). Respondent states that had petitioner and his wholly owned corporation sold the silt in their day-to-day operations during the years 1947 through 1951 while operating the Mary D breaker, the resulting income would unquestionably have been ordinary income.[2] He argues that it therefore follows that when the silt bank was sold in 1956, the gain from such sale should likewise be treated as ordinary income. If we assume that any amount received from silt sales by petitioner and his corporation in 1947 through 1951 while operating the Mary D breaker would have been ordinary income to petitioner, it does not follow that the amount received from the sale of the silt bank in 1956 would likewise constitute ordinary income. While the nature and purpose of the original acquisition of property is to be considered in determining whether the gain upon the sale thereof is ordinary income or capital gain, the ultimate question is the purpose for which it was held. *Mauldin* v. *Commissioner,* 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698. The facts in the instant case differ markedly from those in *Corn Products Co., supra,* and *Mansfield Journal Co.* v. *Commissioner,* 274 F. 2d 284 (C.A. 6, 1960), affirming 31 T.C. 902 (1959), relied upon by respondent. Both of those cases involved contracts for the purchase of the commodity used by the taxpayer in its business operations. The acquisition of the raw material for use in business operations as stated by the courts in those cases is vital to the day-to-day operation of the business. The silt bank involved in the instant case had ceased to be used in any way in petitioner's coal business in 1951, 5 years prior to the date of its sale.

Petitioner had retained the silt bank when he sold the other Mary D breaker properties. He retained it with a view to selling it at some

---

[2] Respondent points out that petitioner actually derived a benefit during 1947 through 1951 from permitting Manbeck to use the slush water from the Mary D breaker without charge since it would have been necessary to extend the Mary D dam if it had grown much larger. While the record lends support to this statement, it does not help in the resolution of the question here involved for the year 1956.

future time when and if a demand for such properties was such that he could obtain a price he wanted. He made no active efforts to sell the property and he did not advertise it for sale. His ordinary business as a coal operator consisted of selling the coal produced by his breaker or his strip-mining operation. The selling of a silt bank which requires the removal and processing of the coal to make it salable is not proximately related to petitioner's other operations in such a manner as to constitute the Mary D silt bank as property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Cf. *Butler Consolidated Coal Co.*, 6 T.C. 183 (1946). We hold that the gain realized by petitioner on the sale of the Mary D silt bank was gain from the sale of a capital asset.

*Decision will be entered under Rule 50.*