San Diego Transit-mixed Concrete Co. v. Commissioner. San Diego Cement Co. v. Commissioner.
San Diego Transit-mixed Concrete Co. v. Commissioner
Docket Nos. 71901, 71902, 77340, 79442, 82239.
United States Tax Court
T.C. Memo 1962-141; 1962 Tax Ct. Memo LEXIS 168; 21 T.C.M. (CCH) 743; T.C.M. (RIA) 62141; June 8, 1962
*168 The petitioners acquired trucks, concrete mixers, and other equipment, some by purchase and some by lease. The leases gave the lessees no option of renewal or purchase. At the end of the lease term the petitioners negotiated an extension or new lease for a reduced rental or purchased the equipment for a price then agreed upon. Held, the petitioners acquired no equity by the lease payments and they are deductible as rentals. Held further, the useful lives of equipment determined. Held further, discounts granted by the petitioners as reductions in price, and not as cash discounts for prompt payment only, should be taken into account in the year of sale. Leroy A. Wright, Esq. *169 , 1434 Fifth Ave., San Diego, Calif., and Adam Y. Bennion, Esq., for the petitioners. James Q. Smith, Esq., and Robert L. Gnaizda, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in corporation income and excess profits taxes in the following amounts: San Diego Transit-Mixed Concrete Co.: Dkt.
No.
Year
Kind
Amount
71901
1952
Income and excess profits
$39,129.62
1953
Income and excess profits
41,010.79
1954
Income
17,374.39
82239
1955
Income
18,103.84
1956
Income
11,721.73
1957
Income
21,317.31
San Diego Cement Co.: 71902
1952
Income and excess profits
8,621.54
1953
Income and excess profits
38,809.62
1954
Income
19,372.48
77340
1955
Income
10,806.61
79442
1956
Income
25,954.88
1957
Income
4,631.96
The principal issue remaining for decision is whether certain contracts whereby the petitioners acquired equipment used in their business were leases, requiring payment of rentals deductible as business expenses, or were purchase and financing arrangements under which the petitioners acquired equity interests in *170 the equipment through payments which must be capitalized. If it is held that the contracts were purchasing arrangements, we are called upon to decide what part of the payments constituted interest, and whether the petitioners may elect to depreciate the equipment on a basis other than the straight line basis. Another issue for decision is to determine what are the useful lives of the several classes of equipment for purposes of the allowance for depreciation. A further issue is whether items entered on the petitioners' books as discounts were true cash discounts, deductible only at the time of payment, or were actually reductions of selling price to be taken into account in the year of sale regardless of the time of payment. Findings of Fact The stipulated facts are found accordingly. The petitioners, San Diego Transit-Mixed Concrete Co. (referred to as Transit) and San Diego Cement Co. (referred to as Cement) are California corporations organized in 1940 and 1947, respectively. Their books are kept and their tax returns are filed on the basis of a calendar year and on an accrual method of accounting. The principal office and place of business of each is in San Diego, California. *171 Their returns for the taxable years were filed with the director of internal revenue at Los Angeles. The business of Transit has consisted of the manufacture, transportation, and delivery to job-sites of transit-mixed concrete. The sole business of Cement was that of hauling for hire, primarily cement, until 1953. In that year its operations were expanded to include the purchase, storage and sale of cement and aggregate. The officers and stockholders of both petitioners were John Henry Caudell, Arthur S. Johnson, and Stewart H. Moore. Caudell was president of Transit and vice president of Cement, and owned one-fourth of the stock of Transit and one-third of the stock of Cement. Johnson was president of Cement and vice president of Transit, and had the same stock interests as Caudell. Moore was secretary-treasurer of each corporation, and owned one-half the stock of Transit and one-third of that of Cement. At the beginning of 1950 Transit had working capital (excess of current assets over current liabilities) of $26,203.24. Its net earnings after taxes amounted to $39,270.93 and $33,161.81 in 1950 and 1951, respectively. In those years it purchased trucks and concrete mixers in *172 the amount of $135,828.23 and invested $94,278.41 in other capital items. At the end of 1951 it had a deficit in working capital of $29,601.72. In all the years Transit has rented some concrete mixers on an hourly or daily basis. It has paid from $6.50 an hour to $10 an hour, depending on size and condition. In 1952 it paid rentals for 1,410 hours in the amount of $12,132.80, and it paid smaller amounts in later years for such equipment rented on an hourly basis. Prior to the taxable years Transit acquired some of its concrete mixers by purchase and some under leases which contained options to the lessee to purchase. The amounts paid thereunder were treated by Transit as payments on the purchase price and were generally capitalized. In September 1951 Transit leased two mixers from Shaw Sales & Service Co., hereinafter referred to as Shaw, for a period of 11 months, payable $1,030 per month and $1,030 in advance. In October 1951 Transit leased three mixers and three trucks from Shaw for monthly rentals of $3,800 for 11 or 12 months, and in November 1951 four mixers for $2,060 per month for 12 months. These leases contained no options to buy or to renew. In April 1952 Shaw offered *173 to sell these nine mixers and three trucks for $38,350 plus tax. Transit purchased this equipment and capitalized this amount as cost. On its tax return for 1952 Transit deducted the rentals paid in 1952 prior to purchasing the equipment. On November 1, 1952, Transit leased two mixers and two trucks from Shaw for 12 months at a rental of $2,600 per month. In January 1953 Transit leased two additional mixers and two trucks for 12 months at $2,600 per month. There was no option to purchase in either lease. In November 1952 Transit leased three mixer trucks from Cook Bros. Equipment Company, referred to herein as Cook, for a term of 21 months at a rental of $1,975 per month, with the first and last months payable in advance. This is identified by Cook as Lease No. 791. In August 1953 Transit sought to renew the lease on the Shaw equipment for a longer term at a lower rental, but Shaw refused. Cook then purchased from Shaw the four trucks and four mixers subject to the November 1952 and January 1953 Shaw leases and leased this equipment to Transit as used equipment under Lease No. 1072 for a term of 18 months from August 1953 at $1,120 per month. In August 1954 Transit purchased the *174 equipment covered by lease 791 for $9,270, and in February 1955 purchased the equipment covered by Lease No. 1072 for $4,506. In 1954, 1955, and 1956 Transit purchased trucks and mixers from Cook, six items in 1954 for about $92,000, two in 1955 for $31,479.62, and one in 1956 for $14,672.17. Transit also leased other equipment from Cook as follows: Lease
No. of
Total
Monthly
No.
Date
Months
Rental
Rental
Items
1336
June 29, 1954
21
$28,980.00
$1,380.00
2
1764
June 21, 1956
21
13,650.00
650.00
1
1779
June 29, 1956
21
84,525.00
4,025.00
5
2005
Feb. 28, 1957
36
65,145.60
1,809.60
4
2008
Mar. 15, 1957
36
72,259.20
2,007.20
4
2010
Apr. 20, 1957
36
64,584.00
1,794.00
3
2011
Apr. 25, 1957
36
90,230.40
2,506.40
5
The items under lease 1336 were leased again at the end of the first term for 10 additional months at $750 per month, and at the end of that period Transit purchased them for $6,000.80 in February 1957. The items of equipment under leases 1764 and 1779 were again leased for six additional months for $2,288 per month, and Transit purchased them in 1958 for $20,020. The 16 items of equipment under *175 leases 2005, 2008, 2010, and 2011 were combined under a new lease, 2126, dated November 7, 1958, for 28 months at $8,320 per month and were still under lease in 1961. Cement had $8,512.50 of capital and surplus at the beginning of 1950. Net income after taxes amounted to $11,394.13 in 1950 and $15,736.35 in 1951. In those years Cement invested some $46,000 in tractors and trailers. At the beginning of 1952 it had working capital of $6,049.61 and capital and surplus of $35,642.98. Cement obtained a contract to haul rock and aggregate for a dam, involving a haul for 27 miles in mountain country, and needed heavier equipment than it had possessed. There was no certainty that after this contract was completed Cement would have further need for this kind of equipment. In September 1952 Cement leased from Cook, under Lease No. 742, four new tractors and four new bottom dump trains for a term of 21 months at a rental of $3,655 per month, with the first and last installments payable in advance. During the course of its hauling contract Cement entered into three additional leases with Cook, Nos. 1000 and 1001, dated May 28, 1953, and No. 1131, dated October 20, 1953, each for 21 months, *176 and providing for monthly rentals of $1,235, $150, and $610, respectively. Cement was able subsequently to secure other hauling contracts involving the use of this equipment, such as airport runways or highway construction. Cement rented some equipment on an hourly basis. In 1953 it rented 25-ton capacity bottom dump trains at $10.32 or $10.46 per hour for 488 hours at a total rental of $5,080, and at rates of $10.20 to $11 in 1955, 1956, and 1957 for substantial amounts. Cement's first lease with Cook ended on June 2, 1954. Cook advised Cement shortly before that date that the equipment subject to the lease could be purchased "as is, where is" for $17,201, including sales tax. Cement purchased the equipment for the amount stated on June 3, 1954. At the expiration of leases 1000, 1001, and 1131, Cement likewise purchased the items subject to the leases for $5,845.25, $669.50, and $2,914.90, respectively, including sales tax, the first two amounts on March 24, 1955, the last on August 8, 1955. During 1955 Cement also paid approximately $120,000 for bottom dump trains, depleting its working capital to $307.70 at the end of 1955. The purchased equipment included 11 items from Cook *177 acquired at a cost of some $95,000. In 1955 and 1956 Cement leased other equipment from Cook as follows: No. of
Total
Monthly
Lease No.
Date
Months
Rental
Rental
Items
1641
Aug. 8, 1955
21
$45,570
$2,170
2
1766
June 26, 1956
21
21,000
1,000
2
1767
June 26, 1956
21
61,740
2,940
4
1791
Aug. 22, 1956
21
47,040
2,240
3
1792
Aug. 22, 1956
21
32,025
1,525
3
The items under lease 1641 were purchased by Cement in May 1957 for $10,260. The items under leases 1766 and 1767 were leased again for a further term of six months for $1,820 per month and purchased by Cement in September 1958 for $15,600. The items under leases 1791 and 1792 were leased again for a further term of six months for $1,742 per month and purchased by Cement in September 1958 for $18,200. The leases entered into with Cook by Transit and by Cement for acquisition of equipment provided for a total rental payable in monthly installments, with the first and last installments payable in advance upon execution. They provided that lessee would pay all license fees and taxes with respect to the vehicles during the term; that the lessor was the owner but the *178 lessee, for convenience, should appear as registered owner; that lessee should abide by all applicable laws, should keep the equipment in good condition, subject to ordinary wear incident to normal use, and if lost, stolen or destroyed, or otherwise rendered unfit for service, should pay lessor the full value stated therein; and should provide insurance and indemnify the lessor against liability resulting from use of the equipment. Lessee agreed to deliver the equipment to lessor at the end of the term and if held over was liable for the same rent from month to month. Lessor had the right of repossession in case of default and various remedies stated in the contract. The leases contained no option on the part of the lessee to purchase the equipment during or at the end of the term. There was no oral agreement or understanding between Cook and either Transit or Cement that the lessee had a right to purchase, nor was there any agreement at the beginning of any lease as to the price at which Cook might offer to sell at the end of the term. The agreements under which the petitioners acquired equipment from Cook and from Shaw in the taxable years were leases and the payments made thereunder *179 were rentals. The petitioners acquired no equity in the equipment by virtue of such rentals. The useful life of the equipment purchased by Transit was as follows: Concrete mixers purchased new - 5 years (equipment Nos. 27, 28, 29, 31, 32, 33, 34, and 37); concrete mixers mounted on trucks, both mixer and truck purchased new - 5 years (equipment Nos. 64, 65, 66, 67, 68, 69, 70, and 75); mixers leased from Shaw and later purchased (equipment Nos. 35, 39, 40, 41, 42, 43, 45, 46, 48, 49, 52, and 53) - 4 years from the time of purchase; trucks and mixers leased from Shaw and later purchased (equipment Nos. 47, 50, and 51) - 3 years from the time of purchase; trucks and mixers leased from Cook and later purchased - 3 years from the time of purchase; an International truck (used) and mixer purchased in April 1950 (equipment No. 36) - 3 years; an International truck (used) purchased in February 1952 (equipment No. 54) - 3 years; a Cook truck purchased new in March 1956 (equipment No. 71) - 5 years; a used mixer mounted on truck #71 - 4 years. The useful life of the equipment purchased by Cement was as follows: Tractors purchased in 1955 (equipment Nos. 36, 37, 38, and 42) - 5 years; semitrailers *180 and pull trailers purchased in 1955 (equipment Nos. 132, 133, 134, 135, 136, 143, and 144) - 5 years; all other items in controversy - 3 years from the time of purchase. Transit followed a practice for many years of granting certain discounts on concrete sold. From 1950 until sometime in 1957 the amount allowed was 50 cents per cubic yard of concrete. The invoice to the customer showed the number of yards sold and the discount to be allowed upon prompt payment. The policy of the petitioner was to allow the discount regardless of the time of payment. The amount of discount was increased to $1 per yard late in 1957 when the price of concrete was increased to more than $10 per cubic yard. The discounts on accounts receivable at the end of the year were included in a valuation account to offset the balance in accounts receivable. The account had a balance of $11,415.90 at the end of 1954. There was a decrease of $195.53 in the valuation account in 1955, and increases of $3,005.95 in 1956 and $6,967.65 in 1957. Cement gave a discount of 25 cents per cubic yard of sand or aggregate at certain times. The policy was discontinued in 1955 and resumed at some time in 1957. The discount was *181 approximately 15 to 20 percent of the selling price. At the end of 1957 there was an allowance of $6,089.93 on the books for discounts pertaining to accounts receivable of about $30,000. The policy of the petitioner was to allow the discounts shown on the bills, regardless of the time of payment. The discounts granted were reductions in selling price and were properly taken into account by the petitioners. Opinion Prior to the taxable years the petitioners acquired some of their equipment by purchase and some by leases with Shaw under which they paid monthly rentals for some nine to eleven months in stated amounts and with the option of acquiring title upon payment of one final payment of a lesser amount. On their tax returns they capitalized the amounts paid as rental as constituting part of the purchase price. Beginning in 1950 the petitioners entered into leases with Shaw which contained no option to the lessee to purchase at the end of the term. The petitioners treated the amounts paid under these leases as rentals deductible on their tax returns. This treatment was followed with payments under subsequent leases with Shaw and leases entered into with Cook. The respondent *182 disallowed the deductions so claimed in the taxable years, determining that the rental payments, except for an element of interest therein, constituted payments for the purchase of the equipment and therefore capital expenditures, the deduction of which is specifically prohibited. Section 23(a)(1)(A) of the Internal Revenue Code of 1939, or its counterpart, section 162(a)(3) of the Internal Revenue Code of 1954, authorizes deductions for "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." A lease contemplates only the use of the property for a limited time and the return of it to the lessor at the expiration of that time, whereas a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of it in the meantime. In re Rainey, 31 F. 2d 197 (D.C. Md., 1929). As we pointed out in Earl L. Lester, 32 T.C. 711 (1959), *183 appeal dismissed (C.A. 5, 1961), the principle involved in the cases dealing with this problem is whether the lessee, as a result of the rental payment, acquires something more than the mere use of the property. If so, he is building up an equity in the property and the payments are not within the definition of rent in the statute. We have held that if the taxpayer, by virtue of lease payments, has acquired or will acquire title to or an equity in the property, the payments, even though denominated as rents, must be treated as partial payments of the purchase price. Quartzite Stone Co., 30 T.C. 511 (1958), affd. on another issue 273 F. 2d 738 (C.A. 10, 1959); Ersel H. Beus, 28 T.C. 1133 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958). The character of the payments is to be determined from the intention of the parties at the time the agreements are made. Estate of Delano T. Starr, 30 T.C. 856 (1958), modified 274 F. 2d 294 (C.A. 9, 1959). The petitioners could have acquired equipment by purchase, by conditional *184 sale, or by lease. They did purchase some items directly. They made some conditional sale contracts. They leased other items on an hourly basis. They acquired some under the leases here involved. Their choice of methods was influenced by a variety of considerations, including the extent to which they anticipated use of the equipment, the amount of capital available for investment, the costs of borrowing funds for purchase, the prices asked for purchase or for rental, and the incidence of taxes involved. The respondent says that the petitioners were tax motivated in leasing this equipment. Consideration of the tax effects of business arrangements is often essential to success in any business. Taxpayers may so arrange their affairs that their taxes may be as low as possible, Gregory v. Helvering, 293 U.S. 465 (1935), and what they did, rather than what they might have done, controls their liability, Seminole Flavor Co., 4 T.C. 1215, 1235 (1945), acq. 1945 C.B. 6; Koppers Co., 2 T.C. 152, 158 (1943). These petitioners chose to procure some *185 of their equipment by leasing contracts which required the payment of rent and which did not accord them any right to take title. This they may do in the exercise of their business judgment, even if the sole purpose of renting instead of buying on installments is to lessen their taxes. It is clear in the present case that there were other good business reasons for their choice of method. The respondent's argument is that the payments called for exceeded the depreciation which would be allowable and therefore the petitioners must have acquired an equity in the equipment through the payments; that the agreements were, in effect, conditional sales contracts because the payments were measured by the purchase price, plus sales taxes, plus interest; that, although no option was given in the contract to the petitioners to purchase the equipment at the end of the term, the facts show that in every instance the lessors then quoted a sale price based on the original computation; and that the petitioners were aware of the lessors' stated position that they would give the lessees the first right of refusal to purchase at the end of the term and that on the purchase price the petitioners received *186 full credit for the rentals paid. The respondent cites Chicago Stoker Corporation, 14 T.C. 441 (1950), Estate of Delano T. Starr, supra, and other cases. The cases cited by the respondent are not applicable here. In Chicago Stoker Corporation, supra, the taxpayer held property under an agreement to pay royalties and had the right to acquire title when a stated amount was paid. The payments, when made, might have been rent or might have applied under the contract on the purchase price, as they ultimately did. There is no such provision in the contracts here. In Oesterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955), reversing a Memorandum Opinion of this Court, there was a purported lease for 67 years with provision for acquiring title by a payment of $10 at the end of the term. This was held to be not a true lease. There are no similar provisions here for acquisition of title. In Estate of Delano T. Starr, supra, there was a lease of a sprinkler system installed by the lessor with the payments in the term covering the full price, and it would have been impracticable for the lessor to repossess the property. *187 This case has no similarity to the leases involving mobile property involved herein. The respondent contends that the agreements were leases in form only and that there was a different understanding between the parties since the petitioners did purchase each item at the end of the term or the renewed term, except for those still under lease at the time of the hearing, and that there is documentary proof that the petitioners had an option to purchase the equipment, even though no such option is stated in the leases and in some cases was specifically disclaimed. The respondent's proof consists of office memoranda and lease orders taken from the files of the lessors. These were private memoranda of the lessors relating to their computations of the rentals to be fixed originally or upon renewed leases or upon sale at the end of the term. The respondent argues that the rentals were so high and the sale price demanded at the end of the lease or the renewed lease so low in relation to the original sale price that the rental payments must have been something more than rent and must have included a payment toward an equity in the equipment. The argument is that at the end of the term the *188 lessor computed the amount at which the equipment would be offered for sale by taking the original sale price, plus sales tax and interest, and allowing credit for all the rent paid, just as if the transaction were a conditional sale from the beginning. These computations were not divulged to the petitioners. The lessors must collect a rent which will exceed the depreciation to them or they will operate at a loss. The lessors would, of course, make sure that all taxes were accounted for in the rental or ultimate purchase price as well as their cost and profit, plus some amount to compensate themselves for the delay in realizing on the disposal of the equipment. This would seem to be the only way to compute the rental. The ultimate selling price depends on the market for used equipment. These computations are irrelevant. What went on on the other side of the fence, unknown to the petitioners, is immaterial and does not prove the existence of an option. The fact that the petitioners ultimately acquired most of the equipment does not prove that they had a legal right from the contract to do so. The representatives of the lessor did testify that the lessors would allow the lessee the *189 first chance to buy the equipment at the end of the lease term. Even if this were understood by the lessees, there was no agreement at the beginning of the term upon the price to be paid for title at the end of the term. Such an understanding could amount to nothing more than a hope that the price then to be asked would be satisfactory to both parties. That the price at which the equipment was then offered for sale was computed with reference to the original sale price when the equipment was new and may have involved the amount previously paid as rentals does not prove that the petitioners acquired an equity. In Estate of Clarence B. Eaton, 10 T.C. 869 (1948), acq. 1948-2, C.B. 2, we held that the amounts paid prior to the exercise of an option to buy were rents and that where the lessee, the United States Government, had the option to purchase the lessor's equipment for the difference between an agreed valuation plus one percent per month and the total rentals theretofore paid, the rentals were not an element of the purchase price but merely one of the factors in its computation, being not "applied" to that price but expressly excluded under the agreed formula. In *190 Joseph A. Harrah, 30 T.C. 1236 (1958), an amount designated in the agreement as rent but which could be applied on the purchase price if an option to purchase was exercised was held to be a prepayment of rent and taxable income to the lessor when received. In Earl L. Lester, supra, we held that where the parties entered into a lease with an option to purchase, the lessee, until the time the option was exercised, acquired no title to or equity in the property and what the lessee had paid prior to exercising the option was rent, citing Benton v. Commissioner, 197 F. 2d 745 (C.A. 5, 1952). The essential inquiry is whether the petitioners through the payments acquired some equity in the equipment. There was testimony concerning the rental value of such equipment and concerning the computation by the lessors of the rentals to be charged and of the amounts to be required for transfer of title or for extension of the lease at the end of the term. These amounts were influenced by competition for the business, by the rapidity of the depreciation or obsolescence of the equipment, and by the amount of investment the lessors could afford to have remaining *191 in the equipment at the end of the term. The prices at which the lessors then offered to sell were substantial in relation to the original selling price. They were quoted "as is, where is," and were affected by the consideration that if the lessees found the price too high, the lessors would have to accept the return of the equipment, recondition and store it, advertise, and pay salesmen's commissions to dispose of it. Both parties considered that the rentals under the contracts were fair rentals and the purchase prices paid for used equipment under the subsequent sales agreements were reasonable. We do not undertake to substitute our judgment for theirs. Under the leases here involved the petitioners had no option or right to purchase the equipment during or at the end of the term of the lease. They did not know at the beginning of the term whether the lessor would sell to them or grant a further lease at the end of the term or what rental would then be demanded for a new lease of the equipment or what price then asked for its purchase when its value would be reduced through usage. The contract did not purport to transfer title at the beginning, nor did it obligate the lessors to *192 do so in the future; hence, the petitioners had no right through the agreement to compel a subsequent transfer of title. Both parties were free to, and did, negotiate new agreements at the end of the term, either for a further lease at a newly agreed rental or for transfer of title at a price newly agreed upon. Or the lessors could repossess the equipment at the end of the term and the petitioners would have no further rights in it. We conclude that the petitioners acquired no equity in the equipment under these leases and that the amounts paid thereunder are deductible as rentals. In view of this conclusion we do not reach the alternative issues of the rate of interest to be allowed on payments under the leases, nor whether the petitioners may now elect to take depreciation on the equipment so acquired on a basis other than the straight line basis. Our findings of fact as to the useful lives of the various items of equipment used by the petitioners dispose of the issue of depreciation. The remaining issue involves certain discounts granted by both petitioners to their customers. The petitioners followed a practice at the end of the taxable year of taking into account the discounts *193 granted on accounts receivable in a valuation account as an offset to the accounts receivable. In the case of Transit the respondent determined that the discounts which had not been allowed at the end of 1955 could not be taken into account as a reduction of accounts receivable and disallowed the deduction of $11,220.37, which represented discounts that had been accrued and allowed in 1955. In the case of Cement, the respondent disallowed the amount of the valuation account ($6,089.93) at the end of 1957. The issue is whether the discounts were in the nature of cash discounts allowed to customers for prompt payment of bills or were actually reductions in selling price. If they are earned only by prompt payment and not allowed otherwise, the discounts which customers may or may not take should not be accrued at the end of a year. If they are to be allowed regardless of the time of payment and therefore are in reality a reduction in the selling price, they should be taken into account in the year of sale. Albert C. Becken, Jr., 5 T.C. 498, 505 (1945), acq. 1945 C.B. 1. The evidence shows that the discounts were substantial in relation to the amounts *194 charged, that they were allowed by the petitioners without regard to the time of payment by the customer, and that the petitioners considered them a reduction in the selling price. The accounts receivable would be overstated unless these amounts, certain to be allowed on payment, were accrued to offset the receivables. The discounts were actually a reduction in selling price. Decisions will be entered under Rule 50.