THE MUNICIPAL BOND CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 85810.   Filed May 16, 1966.

*Joseph A. Hoskins, Charles P. Schleicher*, and *Walter J. Kennedy*, for the petitioner.

*Edward E. Pigg*, for the respondent.

DRENNEN, *Judge:* This case is presently before the Court on remand from the U.S. Court of Appeals for the Eighth Circuit (341 F. 2d 683). The only issue is whether various parcels of real estate sold by petitioner during the years here involved, and parcels sold in prior years on installment sales contracts, payments under which were received by petitioner during the years here involved, constituted property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business within the meaning of section 1221 of the 1954 Code[1] so that the profit realized and received from such sales in the years involved is taxable as ordinary income.

This case was tried in this Court by Judge Morton P. Fisher, deceased, who found, in *Municipal Bond Corporation*, 41 T.C. 20, that all the properties involved were, at the time of sale, held by petitioner

---

[1] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

primarily for sale in the ordinary course of its trade or business. In so doing, the Court relied on the construction of the word "primarily" as used in the statute to mean "substantial" as so construed by the Court of Appeals for the Ninth Circuit in *Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263, and by this Court in *Joseph A. Harrah*, 30 T.C. 1236, and *American Can Co.*, 37 T.C. 198, affd. 317 F. 2d 604 (C.A. 2). On appeal the Court of Appeals for the Eighth Circuit, in *Municipal Bond Corporation* v. *Commissioner*, 341 F. 2d 683, held that this Court had misinterpreted the word "primarily" as used in the statute which, instead of "substantial," was to be accorded its usual and ordinary meaning, i.e., "principally" or "of first importance." Concluding that at least with respect to some of the properties sold this Court's decision might be predicated upon its erroneous interpretation of the word "primarily," the Court of Appeals reversed and remanded the case to this Court for findings based upon the standards set forth in its opinion. The unfortunate death of Judge Fisher in the interim caused this case to be reassigned to the writer to carry out the mandate of the Court of Appeals.

In its recent opinion in *Malat* v. *Riddell*, 383 U.S. 569, the Supreme Court resolved the conflict among the various courts in interpreting the word "primarily" as used in this statute, upholding the view of the Eighth Circuit that it means "principally" or "of first importance," and not simply "substantial."

In its opinion in this case the Court of Appeals not only directed that this Court make findings based upon the above construction of the word "primarily," but also that this Court should make such findings with respect to each individual property sold, including those sold on installment contracts in prior years, and in so doing should not limit its consideration solely to circumstances existing at the time of sale but should also consider the purpose for which the property was acquired, the purpose for which it was held, the motive at the time of sale, and the method of sale. The Court of Appeals also observed that the operations of the other corporations in which the stockholders of petitioner had an interest would have no probative force in establishing petitioner's purpose for holding this real estate except to the extent that it might be shown that the other corporations were acting as agents for the petitioner.

Pursuant to the mandate of the Court of Appeals we make the following findings. While we make findings as to the purpose for which petitioner held each of the individual properties involved, as required by the mandate, we have grouped some of the properties for purposes of discussion and opinion where the discussion in the opinion would explain our findings with respect to each of the properties within the group.

GENERAL FINDINGS OF FACT

We adopt the basic facts, exclusive of the conclusory findings, as found by Judge Fisher in his opinion, 41 T.C. 20, and incorporate those facts herein by reference. We have also made supplementary findings of fact with reference to some of the properties involved which we think are pertinent in carrying out the mandate of the Court of Appeals, which we relate hereinafter.

Petitioner is a corporation, incorporated under the laws of Missouri on October 23, 1924, engaged in the real estate business in Kansas City, Mo. It filed its tax returns on a calendar year basis and the years here involved are the calendar years 1954 through 1958. Charles F. Curry, hereinafter referred to as Curry, was petitioner's principal stockholder and chief executive officer. For more details with regard to petitioner's ownership and operations we refer to the prior opinion of this Court and the opinion of the Court of Appeals, 341 F. 2d 683.

Petitioner acquired many of the properties here involved through the purchase of tax certificates and tax deeds. In 1940, in a single transaction, petitioner purchased tax certificates and/or deeds to various properties located in the Kansas City, Mo., area from Kansas City Power & Light Co. (hereafter, Kansas City Power) for $275,947.83. These certificates and deeds arose out of the delinquency in payment of taxes on these properties for the years 1932 through 1938. At various times after petitioner acquired these tax claims it acquired clear title to some of the properties which were not redeemed by the owners by obtaining a quitclaim deed from the former owner or by instituting suit to quiet title. Details with respect to the individual properties here involved follows.

## 1. Properties Sold under Installment Contracts in Prior Years

FINDINGS OF FACT

During the taxable years in question petitioner received installment payments on 15 sales of real estate located in the Kansas City, Mo., area, made in the prior years 1946–53, inclusive, on which it reported taxable gains as follows:

| Year | Amount |
| --- | --- |
| 1954 | $17,271.06 |
| 1955 | 6,878.91 |
| 1956 | 4,737.58 |
| 1957 | 11,204.55 |
| 1958 | 14,393.22 |

A description of such properties, with the date clear title to each such property was acquired by petitioner, the date of sale, the respec-

tive cost or other basis, the sales price, and the taxable gain from installment payments received in the taxable years, are set forth below:

### THE MUNICIPAL BOND CORPORATION
*Gain from Installment Payments Received*

| | Date clear title acquired | Date sold | Cost or other basis | Depreciation sustained | Expenses of sale | Sales price |
|---|---|---|---|---|---|---|
| 1115 Brooklyn | 1/ 2/48 | 10/31/48 | $650.95 | --- | --- | $3,000 |
| Lot 7, com. plat of Wm. Vineyard Est | 2/ /47 | 1/ /51 | 7,600.11 | --- | --- | 29,130 |
| 1220 Garfield | 8/10/45 | 9/30/48 | 757.75 | | | 5,000 |
| 3263–9 Gillham Rd | 1/ 2/41 | 1/25/49 | 3,615.00 | $639.60 | $1,093.60 | 18,000 |
| 4105 Independence Ave | 1/ 1/46 | 6/30/48 | 539.50 | | | 2,400 |
| 3318 Jefferson | 3/ /50 | 2/19/51 | 810.74 | | 464.50 | 7,500 |
| 1512 Lydia | 1/ 2/49 | 9/ 1/49 | 300.00 | | 258.70 | 3,750 |
| 1600–04 Main St | 6/28/45 | 9/ 8/52 | 4,161.00 | 573.33 | 1,492.15 | 26,500 |
| 1612–14 Main St | 9/30/49 | 1/31/53 | 4,980.00 | | 851.75 | 13,400 |
| 810 Washington | 8/31/44 | 9/ /50 | 757.00 | | 500.00 | 5,000 |
| 1810 Woodland | 1/ 2/47 | 4/13/48 | 380.50 | | | 2,500 |
| 3604 E. 10th St | 12/30/43 | 10/24/47 | 900.00 | 87.20 | 281.74 | 3,250 |
| 817 E. 31st St | 1/ 1/46 | 12/10/47 | 2,599.25 | | | 15,000 |
| 226 E. 33d St | 46 | 8/27/53 | 1,446.00 | 210.67 | 851.75 | 8,950 |
| 517–19 W. 33d St | 4/10/40 | 46 | 1,425.00 | 216.00 | 335.55 | 5,500 |

| | Percent of each installment taxable | Taxable gain | | | | |
|---|---|---|---|---|---|---|
| | | 1954 | 1955 | 1956 | 1957 | 1958 |
| 1115 Brooklyn | 78.302 | $230.30 | $242.12 | $254.91 | $267.72 | $140.34 |
| Lot 7, com. plat of Wm. Vineyard Est | 73.91 | 1,722.30 | 1,722.40 | --- | 3,444.80 | 6,889.79 |
| 1220 Garfield | 84.845 | 239.80 | 344.86 | 338.79 | 359.63 | 381.87 |
| 3263–9 Gillham Rd | 77.38 | 7,205.89 | | | | |
| 4105 Independence Ave | 77.52 | 226.61 | 240.56 | 103.45 | | |
| 3318 Jefferson | 82.996 | 267.97 | 307.32 | 322.31 | 399.08 | 356.43 |
| 1512 Lydia | 85.10133 | 304.91 | 384.21 | 375.87 | 398.69 | 365.13 |
| 1600–04 Main St | 80.83086 | 844.10 | 878.42 | 914.09 | 951.48 | 990.22 |
| 1612–14 Main St | 56.4795 | 290.99 | 302.84 | 315.17 | 328.02 | 341.39 |
| 810 Washington | 74.86 | 374.33 | 335.02 | 406.08 | 388.26 | 107.27 |
| 1810 Woodland | 84.78 | 214.03 | 225.39 | 234.33 | 66.93 | |
| 3604 E. 10th St | 66.32 | 291.28 | 93.50 | | | |
| 817 E. 31st St | 82.6716 | 3,964.21 | | | | |
| 226 E. 33d St | 80.32 | 683.48 | 602.36 | 441.39 | 433.59 | 4,278.85 |
| 517–19 W. 33d St | 71.92 | 410.88 | 408.23 | 165.14 | | |

### (a) 1115 Brooklyn

The property located at 1115 Brooklyn was improved with a two-story brick residence. Initial contact with this property arose by virtue of the tax deeds purchased from Kansas City Power in 1940, and petitioner had possession of the property prior to January 2, 1948. Clear title to the property was acquired by petitioner through a quit-claim deed from a former owner on January 2, 1948. The property was rented before it was sold, and was rented at the time of sale, although the record does not disclose the amount of the rental received. The residence was in a bad state of repair at that time and would require considerable expenditure to put it in good rental condition. The property was located in a poor neighborhood, it was not properly maintained and was subject to vandalism, and petitioner believed it would be better to sell the property to an owner-occupant rather than to con-

tinue holding it as rental property. On October 31, 1948, petitioner sold this property, which it had acquired at a cost of $650.95, for $3,000, resulting in a gain of $2,349.05.

### (b) Lot 7—Commissioner's Plat of the Wm. Vineyard Estate

This property is a part of a larger tract of land, comprising about 240 acres, located in what has been referred to as the Blue Valley area of Kansas City, covered by tax certificates which petitioner purchased from Kansas City Power in 1940. On February 10, 1947, petitioner acquired clear title to this property by purchase from the surviving officers and directors of a defunct corporation known as the Blue Valley Development Co. Lot 7 is a rather large tract of land a portion of which lies in the Blue Valley bottom and a portion of which was on the hillside. It was unimproved. Petitioner believed the property was located in a growth area and that the values of real estate in this area would increase when development became more likely. In January 1951, almost 4 years after acquiring this property at a cost of $7,600.11, petitioner sold this acreage to the Vineyard Investment Co. for $29,130. The officers of Vineyard Investment Co. were anxious to develop the property with residential homes.

### (c) 1220 Garfield

This property had been acquired by petitioner on August 10, 1945, at a cost of $757.75. The property was rented by petitioner between the date of acquisition and the date of sale, producing $200 in rental income. The property was in need of repair, which petitioner was unwilling to undertake under the existing rental scale. The tenant in possession, who was anxious to make the necessary repairs himself, made an attractive offer to purchase the property and petitioner felt it was advisable to sell. On September 30, 1948, petitioner sold the lot and one-story bungalow located at 1220 Garfield to the tenant in possession for $5,000, realizing a gain of $4,242.25 on the sale.

### (d) 3263–9 Gillham Road

On January 2, 1941, petitioner acquired for $3,615 property located at 3263–9 Gillham Road which was improved with a commercial store building on the first floor and apartments on the second floor. This property was rented by petitioner from date of acquisition to 1949 and produced an aggregate of $16,251.65 in rental income for petitioner. In 1949 petitioner received an offer of $18,000 for the purchase of this property from a tenant-occupant and this offer was accepted because repairs were necessary, and petitioner believed that the rental income was inadequate when compared with the offer received. This property was owned by petitioner for 8 years prior to the date of sale.

### (e) 4105 Independence Avenue

Petitioner acquired this property on January 1, 1946. The parcel was improved with a two-story frame building, and was acquired by quitclaim deed from a former owner. Petitioner had a cost basis in this property, per books, of $539.50. This was another of the properties acquired by virtue of the 1940 purchase of tax certificates from Kansas City Power, and when acquired the property was in a dilapidated condition and petitioner experienced difficulty keeping the property rented. The property had been damaged by vandals and petitioner made substantial repairs in order to restore the building for rental use. Because of the difficulties encountered, petitioner decided to sell the property, and it was sold to the tenant-occupant on June 30, 1948, for $2,400. This parcel was owned by petitioner for 2½ years prior to the date of sale. The record does not disclose the amount, if any, of rent received from this property.

### (f) 3318 Jefferson

In March 1950 petitioner acquired real estate improved with a residence at 3318 Jefferson for $810.74. The property was acquired in a quiet title suit arising out of the tax claims against the property which petitioner had acquired from Kansas City Power in 1940. The property produced $150 in rental income for petitioner in 1950, and $15 in 1951. When the premises were vacated the building was in need of repair. Petitioner attempted to rent the property again without expending funds for the necessary repairs, but finally decided to sell the property. Petitioner sold this parcel, less than a year after acquisition, on February 19, 1951, for $7,500.

### (g) 1512 Lydia

On January 2, 1949, petitioner acquired title to property improved with a two-story building located at 1512 Lydia. Petitioner had a claim against this property arising out of the tax certificates purchased from Kansas City Power in 1940. Petitioner had a cost basis in this property of $300. The improvements needed repair, and petitioner expended funds for some repairs and remodeling. The property produced rental income of $140 for petitioner. Some estimates were prepared on the cost of the additional repairs necessary and petitioner elected to sell the property rather than incur these additional expenses. On September 1, 1949, less than 9 months after acquisition, this property was sold for $3,750. Petitioner believed it was better to have the $3,750 rather than to have a continued investment of that amount in this property.

### (h) 1600–04 Main Street

On June 28, 1945, petitioner purchased a vacant lot located at 1600–04 Main Street for $4,161. The property was leased to a parking lot operator and during the period 1945 to 1952 produced rental income for petitioner of $8,030. Harold Oppenheimer, who owned a motorcar operation at the corner of 16th and Baltimore (one block west of 1600 Main Street) contacted petitioner and offered to buy the property located at 1600–04 Main Street. On September 8, 1952, petitioner sold this property, which it had owned for over 7 years to Oppenheimer for $26,500.

### (i) 1612–14 Main Street

On September 30, 1949, petitioner purchased a vacant lot located at 1612–14 Main Street for $4,980. This property was occasionally leased as a parking lot. During the period 1949 to 1953 this parcel produced rental income for petitioner of $375. On January 31, 1953, petitioner also sold this property which it had owned for approximately 3½ years to Oppenheimer for $13,400.

### (j) 810 Washington

On August 31, 1944, petitioner acquired property improved with a warehouse located at 810 Washington at a cost per books of $757. This was another property in which petitioner acquired the tax deed from Kansas City Power in 1940. The property at 810 Washington was rented by petitioner in 1950 and produced $180 in rental income. In 1950 petitioner believed the market value of properties in this area was in excess of the rental income value computed on a capitalization basis, and when a prospective purchaser sought out petitioner and submitted an offer to buy this property, petitioner accepted the offer. In September 1950, 6 years after the date of acquisition of clear title, petitioner sold this property for $5,000.

### (k) 1810 Woodland

On January 2, 1947, petitioner acquired clear title to property improved with a two-story frame house located at 1810 Woodland, at a cost per books of $380.50. Petitioner's initial contact with this property resulted from the 1940 tax deed purchase from Kansas City Power. After acquisition, petitioner had considerable difficulty in maintaining the property and securing a tenant. Petitioner decided that because of the difficulties involved it would be advisable to sell the property. On April 13, 1948, 1 year and 3 months after acquiring clear title, petitioner sold the property for $2,500.

### (l) 3604 East 10th Street

On December 30, 1943, petitioner acquired property improved with residences located at 3604 East 10th Street. Petitioner's books reflect a cost in the property of $900. Upon acquisition, petitioner made the repairs necessary for rental of the property. This property was rented at $27.50 per month and produced rental income for petitioner aggregating $1,155 as follows:

| Year | Amount received |
|---|---|
| 1944 | $330. 00 |
| 1945 | 302. 50 |
| 1946 | 330. 00 |
| 1947 | 192. 50 |

In 1947 because of an increase in value of the properties located in the general area, petitioner decided that it would be advantageous to sell the property. The tenant occupying the premises was contacted [2] to determine if he was interested in purchasing the property, but he indicated at that time that he did not want to buy the property. A few days later a woman and her father were shown the property, and they gave the tenant the impression that they were interested in buying the residence. The following morning the tenant made a deposit to buy the property from petitioner. On October 24, 1947, less than 4 years after the date of acquisition, petitioner sold the property to the tenant for $3,250.

### (m) 817 East 31st Street

On January 1, 1946, petitioner acquired property improved with a two-story store building located at 817 East 31st Street. This property was occupied by a tenant conducting a poultry business. The rent on the property was raised and the tenant attempted to purchase the property but this offer was rejected by petitioner. The property produced rental income to petitioner totaling $2,650 as follows:

| Year | Amount received |
|---|---|
| 1946 | $1, 275 |
| 1947 | 1, 375 |

Within a short period of time after the tenant unsuccessfully attempted to purchase the property, an agent from the Charles F. Curry Real Estate Co. asked the tenant occupying the premises for permission to show the property to a prospective purchaser. Subsequently, the tenant contacted the Charles F. Curry Real Estate Co. and inquired as to whether the building was for sale. When informed that the building was for sale the tenant requested that he might have the first opportunity to purchase the property. As a result, on Decem-

---

[2] Apparently the tenant was contacted by an agent representing the Charles F. Curry Real Estate Co.

ber 10, 1947, petitioner sold the property located at 817 East 31st Street to the tenant for $15,000. Petitioner had a cost basis in the property of $2,599.25.

### (n) 226 East 33d Street

In 1946, petitioner acquired property improved with a two-story residence located at 226 East 33d Street. Upon acquisition, petitioner expended funds for rehabilitating and repairing the property for rent. Petitioner's first contact with this property arose out of the tax deeds purchased from Kansas City Power in 1940. After the property was repaired prospective tenants expressed a desire to rent the property and inquiries were received from interested purchasers. The premises produced rental income aggregating $6,925.30 as follows:

| Year | Amount received |
| --- | --- |
| 1946 | $300.00 |
| 1947 | 275.00 |
| 1948 | 1,033.65 |
| 1949 | 1,140.00 |
| 1950 | 1,140.00 |
| 1951 | 1,146.65 |
| 1952 | 1,120.00 |
| 1953 | 770.00 |

Because of an increase in value of the property, petitioner decided that it would be advantageous to sell. The property located at 226 East 33d Street, which had a cost basis per books of $1,446, was sold by petitioner on August 27, 1953, for $8,950.

### (o) 517–19 West 33d Street

On April 10, 1940, petitioner acquired property improved with a frame store building located at 517–19 West 33d Street. The store building consisted of two storerooms, the corner storeroom was occupied by a beauty shop and the adjoining storeroom was vacant part of the time. Petitioner experienced difficulty in keeping both of the rooms occupied by tenants. This property produced rental income aggregating $2,522.85 as follows:

| Year | Amount received |
| --- | --- |
| 1940 | $262.85 |
| 1941 | 300.00 |
| 1942 | 330.00 |
| 1943 | 285.00 |
| 1944 | 345.00 |
| 1945 | 480.00 |
| 1946 | 520.00 |

The improvements at the time of acquisition required modernizing. Because of increases in value of properties located in that general area petitioner determined the rental income which could be obtained from

this property was insufficient, and decided that in lieu of spending funds for modernization a sale would be more advantageous. In 1946 petitioner sold the property located at 517–19 West 33d Street, which it had owned for 6 years, for $5,500. Petitioner had an original cost in the property of $1,425.

### ULTIMATE FINDINGS

All of the properties discussed above, except those discussed in paragraphs (d), (h), and (i), were held by petitioner primarily for sale to customers in the ordinary course of its trade or business and the gain realized on the sales thereof is taxable as ordinary income. The properties discussed in paragraph (d), 3623–9 Gillham Road, in paragraph (h), 1600–04 Main Street, and in paragraph (i), 1612–14 Main Street, were not held by petitioner primarily for sale to customers in the ordinary course of its business and the gain realized on the sale thereof is taxable as capital gain.

### OPINION

At the outset we point out that in its prior opinion in this case this Court held that even though petitioner had reported the gain on the sale of these properties as capital gains in prior years and respondent had not disturbed such method of reporting, this does not estop respondent from asserting that the gain received on these sales in these years is taxable as ordinary income. The Court of Appeals agreed.

Before discussing the reasons for our findings with respect to the individual properties we think a statement of the general principles upon which we have relied in making our findings would be helpful.

The question whether property is held primarily for sale to customers in the ordinary course of a taxpayer's business is one of fact to be determined from the evidence in each particular case. *D. L. Phillips*, 24 T.C. 435. Various factors have been given consideration by the Court in deciding this question. See *Wellesley A. Ayling*, 32 T.C. 704. No one of these factors is conclusive; rather the totality of the facts in the individual case controls. Respondent determined that the gain realized by petitioner from the sale of real estate was taxable as ordinary income; the burden of proving the negative of that determination is on petitioner.

The Supreme Court said in *Malat* v. *Riddell*, 383 U.S. 569:

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand (*Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other (*Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134). * * *

Petitioner is a corporation whose sole business activity over a number of years has apparently been buying, holding, renting, and selling real estate. While we recognize that a corporation may be an investor in real estate and entitled to capital gain on the profits realized on the sale of such investment property, see *Randolph D. Rouse*, 39 T.C. 70, we find it difficult to understand how the profits realized on the sales of property by a corporation engaged solely in the above business can be considered other than the "profits * * * arising from the everyday operation" of that business, unless the corporation can show by convincing evidence that its primary purpose for acquiring all of its properties, or its primary purpose in acquiring a specific parcel of real estate, was to derive income from the holding of such property rather than the sale thereof, and that the sale of such properties was not inconsistent with that primary purpose. If the principal purpose of the corporation at the time of acquisition of the property is to hold it until the price goes up and then sell it at a profit this would seem to be profit arising out of the everyday operation of that corporation's business and a sale of property held primarily for sale to its customers in the ordinary course of that business.

We do not say that the above approach to the problem should be used or would be appropriate in all cases but we think it best leads the way to the correct conclusions in a vexatious situation such as we have here where, in our opinion, the evidence clearly indicates that petitioner acquired and held its numerous properties with the principal objective of realizing the best profit available therefrom, whether it be from rental or sale, whichever seemed best at the time. We think this approach under these circumstances is entirely consistent with the opinions of the Supreme Court in *Malat* v. *Riddell*, *supra*, and the Court of Appeals in this case, which simply directed the trial courts to determine from the evidence under the legal standards therein pronounced whether the property sold was held by the taxpayer for the "principal" purpose, or purpose "of first importance," of sale to customers in the ordinary course of its business. We use this approach to make the findings required because to accord capital gains treatment to the profits derived from the sale of all the properties here involved except those shown by direct affirmative evidence to have been held primarily for sale to customers would, in our opinion, do violence to the legislative purpose in enacting the capital gains provisions, and might also result in an unintended shifting of the burden of proof.

In arriving at our conclusions with respect to the purpose for which these properties were held by petitioner we have given consideration to all of the various factors used by the courts in cases involving the issue before us, a number of which are recited in *Ralph J. Oace*, 39

T.C. 743. Viewing the evidence in the light of these factors we must conclude that petitioner was in the business of both selling real estate to its customers and holding real estate for investment purposes. But this does not answer our question. We must further determine which of the properties sold were held primarily or principally for sale to customers in the ordinary course of that business and which were not. In deciding this question we have given particular consideration to the factors suggested by the Court of Appeals in its opinion, i.e., the purpose for which the property was acquired, the purpose for which it was held, the motive at the time of sale, and the method of sale.

Petitioner first acquired an interest in most of these properties when it purchased a large number of tax certificates or tax deeds from Kansas City Power in 1940. From time to time it perfected its title to various of the properties covered by the tax certificates or deeds by obtaining quitclaim deeds from the former owners or instituting suits to quiet title. We have very little evidence as to why title was cleared when it was with respect to particular properties. We assume it was because petitioner thought the property was then worth the cost and trouble of clearing title either for investment purposes or for resale purposes. It would be impossible to determine with any degree of accuracy from this record the precise purpose petitioner had for acquiring clear title to the individual properties here involved.

The evidence indicates that some of these properties were improved while others were not; that some of them were rented while others were not. While there is no evidence that petitioner itself engaged in any substantial sales activities with respect to these properties we think it is clear that the Charles F. Curry Real Estate Co. acted as agent for petitioner both in managing and selling its properties; and in fact petitioner did sell a good many properties during the period prior to 1954. We are convinced that petitioner would have sold any of these properties at any time unless its officers felt that a greater profit could eventually be realized by holding the property and/or renting it. We do not find that petitioner was making any specific effort to build up an inventory of income-producing or investment-type properties. It is in this respect that we think the situation here differs from that of a cattle farmer who builds up a dairy herd and occasionally sells culls from the herd. See discussion of this point in Court of Appeals' opinion. As to some of the properties involved here we cannot find from the evidence that petitioner ever intended to hold them.

Turning to the individual properties with which we are concerned here, most of these properties that had improvements on them were located in poor neighborhoods where they were subject to vandalism,

and the improvements on them were in a bad state of repair. Petitioner had difficulty keeping some of them rented. In some instances the rent was so meager that it seems certain petitioner was more interested in having a tenant to protect the property from vandalism than to realize a profit from the rental income. In a number of instances petitioner decided that the cost of making the repairs necessary to rent the property was greater than the rent would justify and that it would be more profitable to sell. In other instances petitioner decided that the properties would never rent for enough to produce a fair return on the current market value of the property. In these cases petitioner decided to sell the properties. We believe a number of these properties were held primarily or principally for sale at all times, and that the rental thereof was merely incidental; but even if they had not been so held prior to the time the decision to sell was made, in our opinion after that decision was made these properties were held primarily or principally for sale to customers in the ordinary course of petitioner's business.

We group in the above category properties (a) 1115 Brooklyn, (c) 1220 Garfield, (e) 4105 Independence Avenue, (f) 3318 Jefferson, (g) 1512 Lydia, (j) 810 Washington, (k) 1810 Woodland, (l) 3604 East 10th Street, (m) 817 East 31st Street, (n) 226 East 33d Street, and (o) 517–19 West 33d Street. While properties (l), (m), and (n) appear to have been rented to satisfied tenants at rentals fixed by petitioner, in each of those instances, petitioner took specific steps, either through the Charles F. Curry Real Estate Co. or on its own behalf, to force the tenant to buy the property or have it sold out from under him.

We have also found that property (b), lot 7 of the commissioner's plat of the Wm. Vineyard Estate, was held primarily for sale. This was a rather large unimproved lot which Curry testified was bought because he thought its value would increase as the area was developed. Petitioner apparently made no effort to improve or develop this property itself—it apparently intended to hold it for sale when the price went up. The property was sold to Vineyard Investment Co., a company in which Curry owned a substantial interest, for development purposes. This property poses a close question but we do not believe petitioner has carried its burden of proving that the property was not held primarily for sale in the regular course of its business. While the purpose and activity of Vineyard Investment Co. with respect to this property cannot be considered in determining petitioner's purpose for holding it, that company cannot be excluded as a customer of petitioner.

With respect to the three properties we have found to be capital assets, property (d), 3623–9 Gillham Road, was acquired by petitioner

in 1941 and was rented continuously thereafter until the date it was sold. It was improved with a commercial store building with apartments on the second floor and produced a fairly substantial rent. Petitioner accepted the tenant's offer to purchase this property 8 years after petitioner acquired it at a figure petitioner could not turn down under the circumstances. This was good investment property and there is nothing to indicate that petitioner was holding it primarily for sale.

Properties (h), 1600–04 Main Street, and (i), 1612–14 Main Street, were both vacant lots which petitioner rented to a parking lot operator. While property (i) did not produce much income, property (h) produced rather good income at very little cost to petitioner. Petitioner made no independent decision or effort to sell these properties. Petitioner was approached by an individual who operated an automobile dealership nearby who wanted to buy the properties for use in his business. The offering prices were good and petitioner accepted them. These were sales of capital assets.

## 2. Sales to Purchasers with Powers of Condemnation

### FINDINGS OF FACT

### (a) Sale of Certain Easement Rights and Property Located at 47th and Elmwood to Kansas City Power

In January 1952 petitioner acquired a vacant lot located at 47th and Elmwood, Kansas City, Mo., for $8,700. Kansas City Power decided to install a new substation nearby. It was ascertained that the powerline from this substation would extend over a tract in the Blue Valley area which, in 1956, had been platted for apartments and/or a shopping center to be known as Vineyard Gardens Subdivision. Petitioner held title to this tract but had contracted to sell it to Vineyard Residences, Inc. It was also ascertained that petitioner's property would be affected by the powerline. The representatives from Kansas City Power discussed acquisition of the property with representatives of petitioner, and the suggested route was opposed by petitioner. After negotiations continued for a period of approximately 2 months, the head of the real estate department for Kansas City Power informed petitioner's agents that if they were not able to agree on price or location it would be necessary to turn matters over to an attorney for condemnation or right-of-way proceeding.

In May 1957 petitioner sold easements over the Blue Valley tract and the land located at 47th and Elmwood to Kansas City Power for $19,602 and $13,200, respectively.

### (b) Sale of Vineyard Vista Tracts to School Board of Kansas City, Mo.

Petitioner acquired numerous lots in the tract of land referred to as Vineyard Vista in 1953. The officials of the School District of Kansas City tentatively selected a site for construction of a new school building in the area in which petitioner owned most of the property. However it was necessary to replat the site, to close off streets, etc., and to acquire some property from others to put the location together for the school site. Petitioner agreed to work this out for the school district, and did so. Although the School District of Kansas City is a political subdivision and has the authority to condemn, the officials did not threaten to condemn in this case. On July 5, 1957, petitioner entered into a contract to sell the approximately 5.19 acres involved to the School District of Kansas City for $36,870, and petitioner reported the $10,287.45 gain on the sale on the return filed for 1958. This was the only sale of real estate by petitioner in the taxable year 1958.

### OPINION

Respondent determined that the proceeds from sales of certain easement rights and property located at 47th and Elmwood to Kansas City Power, and the sale of approximately 5.19 acres of the Vineyard Vista tracts to the School District of Kansas City resulted in ordinary income to petitioner rather than long-term capital gain as reported on the return filed by petitioner.

These two transactions were specifically cited by the Court of Appeals for the purpose of showing that we had failed to give the word "primarily" its proper interpretation.[3] The evidence does establish that both sales were made to purchasers that possessed condemnation power, and it may fairly be assumed that petitioner was aware of the existence of this power. We do not believe petitioner was anxious to sell these properties, or was holding them primarily for sale, but instead sold these properties rather reluctantly with the knowledge that the purchasers could probably have forced a sale had petitioner not worked out agreements with them. We have therefore concluded that these two sales were not sales of property held primarily for sale to customers in the ordinary course of a trade or business. *Commissioner v. Pontchartrain Park Homes, Inc.*, 349 F. 2d 416 (C.A. 5, 1965), affirming per curiam a Memorandum Opinion of this Court.

---

[3] A third transaction specifically mentioned by the Court of Appeals, the sale of property located at 1308 Locust to the American Red Cross in 1955, has been conceded by respondent to have been a sale of a capital asset.

### 3. Sale of Lots 10 through 21, Block 1, North Blue Banks

#### FINDINGS OF FACT

Curry had been a member of the Calvary Baptist Church for many years. Curry received a letter from the pastor of Southeast Baptist Church (a mission church of the Calvary Baptist Church) dated August 25, 1955, which inquired in part as follows:

Could you advise me as to the availability of the lots between Vanbrunt and Hardesty just North of 43rd St., where S.E. trafficway is to be built. In talking with the City planning dept. this seems like a good location for our future church. In your opinion are there better locations in the vicinity?

Is it likely that there will be a new subdivision east of Vanbrunt adjoining 39th St.?

I appreciate the time you have already given and at your earliest convenience I shall look forward to hearing from you on these matters; as you are a successful [sic] operator in this area we value your opinion highly.

The Southeast Baptist Church had been occupying a basement church located at 45th and Kensington. Petitioner sold lots 10 through 21, block 1, North Blue Banks, to the Southeast Baptist Church in July 1956. This property, which had been acquired by petitioner in January 1950, had been held by petitioner for over 6 years prior to sale and had not previously been offered for sale by petitioner.

#### OPINION

The evidence presented relative to the sale of lots 10 through 21, block 1, North Blue Banks, in July 1956, fails to support respondent's determination that this specific property was held by petitioner primarily for sale to customers in the ordinary course of its trade or business. It is rather obvious from the evidence that Curry was trying to satisfy the need and desire of his church for a location for its new mission church in a developing neighborhood and that this was the reason petitioner sold this property to the church. Petitioner had held this property for over 6 years prior to the sale, and there is no evidence that petitioner ever made any effort on its own part to sell this property or had any desire to do so. This is another transaction specifically discussed by the Court of Appeals and we believe the evidence as a whole establishes that petitioner was not holding this particular property primarily for sale.

### 4. Sale of Tract Located at 47th and Elmwood

#### FINDINGS OF FACT

In August 1957, petitioner sold a tract of land containing 10 acres located at the corner of 47th and Elmwood. This property, to which clear title had been acquired in January 1952 and May 1953, was improved with a residence that had been rented from 1952 to 1957.

This property was sold to one [4] of the construction-development corporations in which Curry had an interest. The sales price was $24,750, and petitioner had costs and expenses of sale (less depreciation) of $22,973.81, resulting in a gain of $1,776.19.

OPINION

The sale of the 10-acre tract located at 47th and Elmwood occurred in 1957, and the property was purchased by one of the construction-development corporations in which Curry had a stock interest. The only other sales of real estate by petitioner in 1957 were the property and easements sold to Kansas City Power, referred to above, and the sale of property located at 5801 East 50 Highway, discussed in greater detail below.

The property sold was improved with a residence which had been rented from 1952 to 1957. Apparently the property was located in a growing area, and perhaps it was later subdivided into smaller lots and developed by the purchaser. The issue is close and there is not too much evidence in the record that would help characterize this transaction either way; however, we think the evidence we do have tips the scales in petitioner's favor. We find that this property was not held by petitioner primarily for sale to customers, and we find for petitioner as to this transaction.

### 5. Sale of 5801 East 50 Highway

FINDINGS OF FACT

On April 3, 1950, petitioner purchased a tract of real estate improved with a filling station, located at 5801 East 50 Highway, for $17,500. The property was subject to an existing lease agreement with Leo A. Ratty, doing business as Leo's Petroleum Co., at the time the property was purchased by petitioner. The lease was dated July 14, 1947, and was for a 5-year term at a monthly rental of $150 per month. The lease was renewable at the end of the first 5-year period at a monthly rental of $200 per month, and was renewable for an additional 5 years at a monthly rental of $250 per month. Under the terms of the lease agreement the lessee had an option to purchase the property at the end of any 5-year period for $22,500. The lessee exercised the option on June 1, 1957, and bought the property for $22,500. The sale of this property resulted in a net gain to petitioner of $9,422.33.

OPINION

This property, when acquired by petitioner, was subject to an existing lease and option to purchase, and the lessee exercised the

---

[4] The evidence indicates the purchaser was either Vineyard Residences, Inc., or Elbel Construction Co.

option at the end of a rental period. Although it has been held that the existence of an option to purchase constitutes a continuing offer to sell, see *Joseph A. Harrah*, 30 T.C. 1236, under the circumstances surrounding this particular transaction we believe the existence of the option cannot be deemed of controlling significance. Petitioner did not grant the option initially. This property was held by petitioner as income-producing property for 7 years with a graduating rental provision in the lease and petitioner made no effort to sell it. It is true that the lessee exercised its option to purchase at the end of the second 5-year term, but we believe under these facts petitioner has successfully established that the property was not held primarily for sale to customers in the ordinary course of its trade or business. We sustain petitioner as to this transaction.

*6. Sale of the East 200 Feet of the South 556.7 Feet of the Northwest Quarter of the Southwest Quarter of Section 25, T. 49, R. 33*

### FINDINGS OF FACT

In February 1955, Allen K. Gibbon, who had been engaged in the lumber business for several years and had engaged in numerous business transactions with Curry in the past, approached Curry and stated that he wanted to buy some unimproved property fronting on Eastwood Drive. This property had been acquired by petitioner in January 1952 and is described as the "East 200' of the South 556.7' of the N.W.¼ of the S.W.¼ of section 25, T. 49, R. 33." For about 30 years Gibbon had lived across the street from the tract he desired to purchase and knew that Curry had an interest in the property. Gibbon wanted to build a home on the property and he told Curry that he was interested in having some of his neighbors buy the adjoining property and establish a small neighborhood in this area. There were no "For Sale" signs placed on the property and Curry was not particularly interested in selling this vacant ground to Gibbon. Finally Curry agreed to sell the property to Gibbon on a contingent contract arrangement and in May 1956 the sale of this property was completed and recorded on the books of petitioner. The sale of this property, which had been owned by petitioner for over 4 years prior to the date of sale, resulted in a gain to petitioner of $2,622.80. Since the original purchase, Gibbon has unsuccessfully attempted to buy other property in this area from Curry.

### OPINION

The evidence as to this transaction indicates that the sale to Gibbon was entered into reluctantly by petitioner, apparently only after Curry had been satisfied that the contemplated improvements that Gibbon planned to construct on the land would not be detri-

mental to the value of the adjoining land. As to this parcel petitioner offered sufficient convincing proof to establish that this land was held for investment purposes. No active sales effort was utilized, and no "For Sale" signs were placed on the property. We sustain petitioner as to this transaction.

## 7. *Miscellaneous Sales to Corporations in Which Curry Owned a Stock Interest*

FINDINGS OF FACT

### (a) 1500–06 Walnut Street

In September 1948 petitioner acquired a parcel of land located at 1500–06 Walnut Street, which property had been rented by petitioner to the Schooley Stationery Co. for some time for use as an employee parking lot. The property produced an aggregate rental income to petitioners for the period 1948 to 1956 of $16,074.05. The building immediately south and adjacent to 1506 Walnut Street was owned by the E. K. Carter Development Co. (hereinafter referred to as Carter), and was the subject of lease negotiations then being conducted by Carter and the Goodyear Tire & Rubber Co., Inc. Curry owned all of the stock of Carter. Goodyear desired to lease the building owned by Carter as well as the adjacent parking lot owned by petitioner. In order to bring the two properties [5] under one ownership, petitioner sold this property to Carter in February 1956.

### (b) Lots 1 and 4, Block 3, Resurvey of Perwin Place

Petitioner acquired lots 1 and 4, block 3, resurvey of Perwin Place, in August 1949. Carter owned lots 2 and 3, block 3, resurvey of Perwin Place, located between the two lots owned by petitioner. The Clark Oil & Refining Corp. desired to lease the combined lots, on a long-term basis, under an arrangement whereby the lessor would erect substantial improvements on the property. Therefore, in order to combine title to all four lots in Carter, petitioner sold lots 1 and 4, block 3, resurvey of Perwin Place, to Carter in January 1955.

### (c) 4502 Elmwood

In January 1955, petitioner sold a vacant lot located at 4502 Elmwood to the Elbel Construction Co., in which Curry owned a 50-percent stock interest. The purchaser wanted to purchase this lot in conjunction with the development of property adjoining 4502 Elmwood.

---

[5] Although the stipulation indicates this property was sold in February 1957, petitioner's income tax return reports the sale as occurring in February 1956, and the parties have treated the sale as having been consummated in the earlier year.

### (d) 1720 Walnut Street

In August 1955 petitioner sold a vacant lot at 1720 Walnut Street to the Jach Investment Co. Curry and his wife together owned all of the stock of Jach Investment Co. The vacant lot located at 1720 Walnut Street had been acquired by petitioner in December 1946, and had been leased as a parking lot. The Jach Investment Co. owned adjacent land improved with a building and desired to acquire the vacant lot located at 1720 Walnut Street, thereby owning both parcels, and combining the properties under one lease that was then being negotiated with a machinery distributing agency.

### (e) 4609 East 45th Street; 4601 Elmwood; 4600 Lister

Petitioner acquired property located at 4609 East 45th Street in March 1954. Petitioner acquired property located at 4601 Elmwood in January 1950, and it acquired property located at 4600 Lister in April 1954. These three parcels of vacant land were sold by petitioner in a single transaction to the Elbel Construction Co. in September 1955.

#### OPINION

In the taxable years 1955–56 petitioner sold some eight separate parcels, in five separate transactions, to corporations in which Curry owned a stock interest. The circumstances surrounding each transaction are sufficiently similar, we believe, to permit disposition of all five sales in one brief opinion. As to most of the sales, petitioner introduced evidence at the trial indicating that the purchasing corporation was interested in acquiring the property concerned because it wanted to combine the title in one corporation, apparently believing this would more readily permit a lease of both parcels. Petitioner urges us to place considerable emphasis on the reasons why the purchaser bought the property in order to ascertain the purpose for which petitioner held the property at the time of sale. We reject this argument for several reasons. First, we do not believe that the separate corporate entities in which Curry had an interest, having been recognized for some purposes, should be ignored for other purposes. Although it may be true that Curry believed it was advantageous to have title to the parcels involved in the lease negotiations placed in Carter, this does not mean that this same desire may be ascribed to petitioner. It should be noted that these sales resulted in gain to petitioner; these were not mere transfers of title at cost between two related corporations. If petitioner was holding these properties for investment purposes, it would seem that petitioner would have been more anxious to buy than to sell in each instance. In addition, the number, frequency, and continuity of

sales during the taxable years 1955 and 1956 indicate that these transactions were properly characterized by respondent as the sale of inventory property, and that the sales were made in the ordinary course of petitioner's trade or business.

We sustain respondent's determination as to these transactions.

## 8. Sale of Properties Located at 914, 916, and 924 East Eighth Street

### FINDINGS OF FACT

Petitioner acquired clear title to the three parcels located at 914, 916, and 924 East Eighth Street in October 1948. Contact with these parcels was first had by petitioner as a result of the tax claims acquired by petitioner in 1940 from Kansas City Power. Petitioner had rented these properties, each one of which was improved with an old brick house, throughout the years 1948 to 1954, and derived rental income as follows:

| Property | Rental income |
| --- | --- |
| 914 East 8th St | $1,290.50 |
| 916 East 8th St | 3,094.50 |
| 924 East 8th St | 2,149.50 |

In 1954 a prospective purchaser made an attractive offer on these three properties and petitioner sold the parcels located at 914 and 924 East Eighth Street in May 1954; and the property at 916 East Eighth Street was sold by petitioner in August 1954. Curry subsequently learned that the approaches to the midtown freeway, which was to be constructed in Kansas City, encompassed the area occupied by these properties.

### OPINION

The sale of these three parcels in 1954 must be characterized in a manner consistent with our determination as to the sale of the 15 properties which produced the installment sale income discussed above. These properties were acquired under the same circumstances, and they were sold by petitioner when the offering price was large enough to be considered very attractive to petitioner. The number, frequency, and continuity of sales in the taxable year 1954, combined with the apparent willingness of petitioner to sell the properties when the price was right, are strong evidence that these were inventory properties held primarily for sale to customers in the ordinary course of petitioner's trade or business.

The fact that these properties produced rental income throughout the years 1948 to 1954 is not of controlling significance, because we believe that the rental aspect of petitioner's business, at least with respect to these properties, was incidental to the holding of the properties primarily for sale.

We sustain respondent's determination as to these transactions.

### 9. Sale of Four Parcels Located in the "Frisco Tract"

FINDINGS OF FACT

On February 10, 1947, petitioner acquired clear title to a large tract of ground in the Blue Valley area of Kansas City, Mo., by warranty deed from the surviving officers and directors of a defunct corporation known as Blue Valley Development Co. for a cost of $2,500. Petitioner's initial interest in this property was acquired through its purchase of tax claims from Kansas City Power in 1940. After capitalization of tax liens, payment of other back taxes, and other necessary expenditures for the acquisition of clear title, the books of petitioner, at the end of 1947, reflected a cost in this property of $22,801.94. Included within this large tract of land located in the Blue Valley area was a smaller level tract containing approximately 87.3 acres (hereinafter referred to as the Frisco tract) lying along and adjacent to the right-of-way and tracks of the St. Louis-San Francisco Railway (hereinafter referred to as Frisco Railway). Curry believed this property was ideally located for industrial development.

After petitioner acquired clear title to this property, petitioner contacted the Frisco Railway to determine whether that company would be interested in developing the Frisco tract for industrial use. Petitioner was anxious to obtain Frisco Railway's cooperation in contacting industry for construction of plants on the property, for aid in financing development of the property, and for assurance that the railroad company would add any necessary spur tracks and switches to its line. Frisco Railway did not express any great interest in the development of this property initially.

However in 1949 or 1950 an officer of Frisco Railway contacted Curry in Kansas City about the development of the Frisco tract. Extended negotiations ensued during the course of which, in August 1950, Frisco Railway was authorized to submit this property to Ford Motor Co. to select a plantsite thereon at a sales price of 10 cents per square foot. During the course of the negotiations between petitioner and Frisco Railway several alternative methods of developing the property were discussed, including a lease of the entire tract to Frisco Railway, a lease with an option to purchase, and an outright sale to Frisco Railway. Petitioner was willing to sell the entire Frisco tract for $3,500 per acre because Curry believed that price was above the market value of the property at that time. Frisco Railway did not want to buy the entire property at that price. Instead it suggested a 10-year lease with an 89-year renewal option. Petitioner was anxious to have Frisco Railway make a substantial investment in the property at that time to assure its continued interest in the property.

On January 1, 1953, petitioner entered into an agreement to lease the Frisco tract to the Frisco Railway for an initial term of 10 years

with an option to renew for an additional 89-year term. The lease provided for an annual rental of $100 per acre, reduced to $30 per acre for a maximum period of 36 months until a street or highway was extended into the property. The agreement gave Frisco Railway an option to purchase any portion of the leased premises at any time for $4,000 per acre. To satisfy petitioner's interest in having Frisco Railway make an immediate financial commitment in the property, the railway company suggested that it would purchase, within 10 days after execution of the agreement, 5 acres of the leased premises, to be later designated by the railway, for $4,000 per acre. After execution of the agreement Frisco Railway placed the sum of $20,000 in escrow but did not actually designate the 5-acre tract until 1954.

In addition to the 5-acre tract, Frisco Railway also purchased a 7.91-acre parcel in the Frisco tract in 1954, and an 0.92-acre tract and a 2-acre tract in 1956, all presumably under the option contained in the lease agreement. Respondent determined that these transactions were sales of property held primarily for sale to customers in the ordinary course of petitioner's business.

### OPINION

In our opinion, at least after the execution of the agreement with Frisco Railway in 1953, petitioner must be considered to have been holding the property covered by that agreement primarily for sale to customers in the ordinary course of its trade or business. It is true that the agreement was in the form of a lease but it also contained an option on the part of Frisco Railway to purchase any part of the property at any time at a fixed price per acre. This gave Frisco Railway control of the property and in effect constituted a continuing offer to sell the property on behalf of petitioner while the agreement was in effect. See *Joseph A. Harrah, supra.*

Petitioner entered into this agreement of its own accord and the evidence indicates that petitioner actively sought such an agreement or some arrangement for the sale and development of this property in industrial lots. The evidence also indicates that after the agreement was executed the Charles F. Curry Real Estate Co. was actively promoting the development of this land. The sale of the four parcels here involved resulted in a substantial profit to petitioner, as would the sale of any parcel at the option price, but after the agreement was executed petitioner could no longer be said to be holding the property for increment in value due to mere passage of time, because the selling price was fixed by the terms of the agreement. The agreement clearly contemplated continuing sales of parts of this property over a period of time.

It is true that petitioner received rental income from the property under the terms of the agreement, and this cannot be ignored. How-

ever, it would appear that the rent agreed upon was intended more for the privilege of controlling the property than for use of the property. We think the evidence is pretty clear that petitioner was primarily interested in selling the property rather than leasing it. Frisco Railway was not interested in financing the construction of buildings for leasing and there is no indication that petitioner ever constructed any buildings for leasing or even examined the prospects of doing so in any detail. There was also testimony indicating that "For Sale" signs were placed on the property and that an advertisement was placed in the newspapers offering the property for development purposes.

In addition to granting Frisco Railway a lease of the property with a unilateral option to purchase, the agreement of January 1, 1953, was also a binding contract of sale of 5 acres, because Frisco Railway immediately put $20,000 into escrow to be paid to petitioner when it designated the 5 acres it wanted. Petitioner argues that the sale portion of the agreement was designed to provide a "security interest" in the property whereby Frisco Railway would become more directly involved in the active development of the property and would renew the lease at the expiration of the original 10-year term. We are not convinced that the Frisco Railway would be any more likely to renew the lease at the end of the initial term because it owned 5 acres of the tract in fee than would otherwise have been the case. Presumably the officers of the railway thought it would be possible to definitely ascertain within the 10-year period the prospects for the future, and if the expected development had not occurred within that time they presumably would forgo the option to renew, regardless of their outright ownership of 5 acres. It should also be noted that petitioner sold over 15 acres of the tract in these four transactions which bolsters respondent's argument that the option constituted a continuing offer to sell.

The sales occurred in taxable years when petitioner was rather extensively engaged in the sale of real estate, and we believe the evidence establishes that these four properties were properties held by petitioner primarily for sale to customers in the ordinary course of its trade or business. We do not believe the fact that all four of these sales were to the same purchaser makes that purchaser any less a customer or petitioner's actions any less a trade or business under the circumstances. We sustain respondent's determination with respect to these transactions.

---

We believe the above discussion covers each of the individual real estate sales which either took place or resulted in the receipt of income to petitioner during the years before us, and satisfies the mandate of the Court of Appeals. While such a determination of subjective intent

is necessarily inexact, we are convinced that petitioner was engaged in the business of holding property for both sale and investment purposes and we have used our best judgment, based on the evidence presented, to determine which of the properties sold were held primarily for sale to petitioner's customers in the ordinary course of that business, bearing in mind that the burden of proof is on petitioner to prove which of the properties were not held primarily for sale.

*Decision will be entered under Rule 50.*