RALPH S. NORRIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Norris v. Commissioner
Docket No. 11344-83.
United States Tax Court
T.C. Memo 1986-151; 1986 Tax Ct. Memo LEXIS 457; 51 T.C.M. (CCH) 852; T.C.M. (RIA) 86151; April 16, 1986. *457 Held: Petitioner held real estate primarily for sale in the ordinary course of his trade or business and profits from sales of such real estate constitute ordinary income; petitioner's profits from real estate sales in 1973 and 1978 are decreased by costs of renovations and repairs; amount of 1978 loss attributable to theft of coin collection determined; and petitioner liable for additions to tax pursuant to sections 6651(a), 6653(a), and 6654. Ralph S. Norris, pro se. Christine Colley, for the respondent. WHITAKER
MEMORANDUM FINDING OF FACTS AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
[1] 6651(a)(1) 6653(a)
6654
1973
$1,072
$268
$53
$34
1974
6,066
1,516
303
194
1976
3,709
927
185
138
1977
2,035
509
102
73
1978
21,408
1,070
1979
517
129
51
After concessions by the parties, the issues for decision are: (1) Whether petitioner held real estate primarily for sale to customers in the ordinary course of a trade *458 or business, thereby requiring profits from the sales of such property to be reported as ordinary income; (2) whether petitioner's profits from sales of certain real estate in 1973 and 1978 should be decreased by costs of renovations and repairs; (3) whether petitioner is entitled to a theft loss deduction in 1978 and, if so, the amount of the deduction; and (4) whether petitioner is liable for additions to tax pursuant to sections 6651(a), 6653(a), and 6654. FINDINGS OF FACTS Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioner resided in North Leeds, Maine, at the time his petition was filed. Petitioner began purchasing real estate in 1969 with funds borrowed from his mother, uncle, and banks. With the exception of $88 in 1978 and $609 in 1979, petitioner's sole source of income during the years in issue was his real estate activities. Petitioner's real estate activities generally involved locating and purchasing property, making necessary improvements, renovations, and/or repairs and, after holding the property for the period necessary to qualify for long-term capital gain treatment, *459 [2] selling it. In 1970 petitioner obtained a real estate broker's license which he kept active until 1980. After obtaining this license, petitioner undertook to sell a few parcels of property for third parties. He found this unprofitable and, thereafter, his real estate sales, as well as purchases, were exclusively on his own behalf.With the exception of three to four pieces of property sold by other brokers, petitioner made all 39 sales of his real estate during the years 1973 through 1979. Petitioner's real estate activities kept him on the road every day trying to locate appropriate property and doing necessary improvements, renovations, and repairs. He was involved in negotiating all aspects of both the purchase and sale of his real estate. Petitioner maintained an office in his home which he used in the conduct of his real estate activities. Generally, some improvements, renovations, or repairs were necessary *460 to increase the salability of each piece of property petitioner purchased. As petitioner stated "* * * basically, any parcel of property you have, you buy, something has to be done to it before you can sell it." If the property was raw land, such improvements might include surveying and marking the property lines, hauling gravel for a road into the property, and/or having debris hauled away and "clean[ing] up" the land. When petitioner acquired improved [3] property, he generally undertook to "redo" with the cheapest materials possible so that he could "get rid of the property." In some, if not all, instances petitioner located his improved real estate purchases through the Farmers Home Administration which notified him when they had an abandoned or repossessed home on which he could bid. The renovations and repairs he made to these properties were necessitated by the fact that the buildings were not in a habitable, i.e., resalable, condition when he purchased them. It usually took about 2 years to get this type of property ready for resale and encompassed significant renovations or repairs. For example, on September 3, 1970, petitioner purchased a single family dwelling of six rooms *461 and a bath which had been abandoned. Prior to resale in July 1973, renovations at a cost of approximately $3,000 had been made, which included repair of the furnace, installation of new bathroom fixtures and a sink in the kitchen as well as replacing all of the pipes and faucets. Similarly, in August 1975, petitioner purchased a single family three-story dwelling which he converted into two full apartments and a smaller 2-room attic apartment prior to resale in September 1978. Since the building was gutted when purchased, these renovations included installation of three bathrooms with all new fixtures, new cabinets, carpeting and plywood paneling throughout, insulation, and windows and repair of the furnace and heating system. These renovations cost approximately $14,000. Again, prior to petitioner's September 1, 1978, resale of improved property he had purchased in 1970, substantial repairs including installation of an asphalt shingle roof, a brick chimney, porch, window sills, and cedar shingle siding for the entire building at an aggregate cost of approximately $6,000, were required. Finally, the single-family home petitioner sold on March 10, 1978, required the following *462 repairs prior to resale: installation of a new bathroom including tub, lavatory, and tile; new kitchen cabinets; and carpeting in the living room and upstairs. These repairs cost approximately $3,000. [4] Petitioner generally rented improved property during the period he was making or completing renovations and repairs or while locating a buyer. Of the six parcels of improved property sold by petitioner during the years in issue, at least four were occupied prior to sale. In two of these instances, petitioner was unable to collect any rent. The improved property sold in 1977 was occupied by the buyer for approximately 2 years prior to sale but the record does not indicate whether the rent paid during *463 this period was applied to the purchase price or at what point during the occupancy the sale was negotiated. By 1979 petitioner had sold all of his improved real estate and, therefore, and no rental income in later years. To facilitate sales, petitioner advertised in local and out-of-state newspapers and some magazines. While buyers would frequently become interested in improved property while petitioner was working on it, most property was sold through some type of advertisement. In July 1974, petitioner bought a helicopter to use in his real estate activities. He advertised in the New York Times for potential buyers whom he would pick up at the local airport and, via helicopter, show available property. He sold two pieces of real estate in this manner. In 1976 he sold the helicopter at a gain of $2,600 having found this method of sale too costly. In computing petitioner's income from real estate activities, respondent allowed deductions for business expenses such as advertising, insurance, interest, taxes, license fees, gas, and oil as follow: Year
Amount
1973
$4,637
1974
$6,217
1975
[5] *464 12,075
1976
8,557
1977
8,195
1978
11,804
1979
9,485
Petitioner, of course, preferred cash buyers. However, if he could not find a cash buyer, he would get as large a down payment as possible and finance the balance of the sale price. The following tables reflect the details of petitioner's real estate sales: [6] *465 INSTALLMENT SALES
Date
Date
Sale
Gain/
Year
Acquired
Sold
Price
(Loss)
1973
9/3/70*
7/1/73
$7,000
$0
1974
7/1/72 2/8/74
11,000
7,000
1/18/73 9/3/74
22,000
13,736
4/7/69 4/8/74
3,500
2,336
6/28/72 1/5/74
6,500
3,500
10/8/73 4/74
5,000
2,736
1975
8/1/74 8/75
6,500
3,650
4/24/73 12/4/75
6,000
3,600
1976
12/6/74 5/76
4,500
2,500
12/14/72 12/18/76
10,000
6,600
9/14/73 12/3/74 8/76
4,500
2,550
1977
4/22/74 7/77
8,000
5.667
7/22/74*
9/1/77
14,000
10,500
6/11/71 9/15/77
3,000
1,500
10/8/73 4/77
7,000
5,500
1978
8/19/75*
9/12/78
18,000
500
1970*
9/1/78
14,000
4,500
1979
COMPLETED SALES
Date
Date
Sale
Gain/
Year
Acquired
Sold
Price
(Loss)
1973
6/26/72*
5/7/73
5,500
675 5/10/73 8/23/73
4,000
675 10/26/71 5/24/73
5,000
3,275 5/15/72 2/24/73
5,500
3,500 1/3/73 5/15/73
6,000
1,175 2/17/71 4/23/73
3,000
1974
10/1/71 12/6/74
5,000
10/1/71 9/27/74
12,000
5,236 3/29/72 3/24/74
12,500
7,500 6/2/72 3/20/74
5,015
3,515 4/74 11/74
8,000
(265)
4/74 4/74
4,000
2,476 1975
3/20/70 4/24/75
1,000
(2,050)
1/3/73 8/22/75
9,000
3,950 1976
5/21/71 3/5/76
3,000
2,750 2/8/74 5/76
10,000
5,000 7/1/73 1976
2,500
1977
1978
11/17/75*
3/10/78
10,000
2,500 8/7/73 5/15/78
1,800
300 9/3/76 5/24/78
55,000
38,000 1974 1978
6,508
4,198 1979
1974-76 1979
10,487
3,071 The asterisked sales in the above tables were of improved property. [7] During the years 1973 through 1979 petitioner's aggregate real estate sales were $335,310 with an aggregate gain of $161,856. [8] Petitioner's income from his real estate activities during the years in issue, ws as follows: 1973
1974
1975
1976
1977
1978
1979
Completed
Sales
$ 9,300
$18,462
$ 1,900
$ 3,250
$47,998
$ 3,104
Installment
Sales -
[9] *466 Principal $79
7,535
2,583
4,324
4,232
13,265
Installment
Sales -
Interest
527
2,181
4,202
5,988
8,387
9,896
14,010
Rent
390
3,120
3,736
5,320
7,959
$10,296
$28,178
$11,805
$17,298
$17,939
$79,118
$17,114
On January 10, 1978, petitioner's house was burglarized and a gun collection and safe containing petitioner's real estate documents and a coin collection were stolen. In petitioner's absence, the burglary was reported to the Sheriff's office by petitioner's neighbor who identified herself as the caretaker. The investigating officer interviewed this neighbor, her husband, and a third acquaintance of petitioner. The "caretaker" specified that among the safe's contents was petitioner's coin collection "worth around $20,000." [10] On his 1978 Federal tax return, petitioner claimed he had suffered a $15,357 loss as a result of the burglary. [11] Of this amount, petitioner's insurance company paid $5,357 to cover the loss of his gun collection and damage to the house. No reimbursement was made for his papers or coins. Petitioner did not include the coin collection in his claim to the insurance company ostensibly because he had failed to separately insure it. Petitioner claimed a deduction of $9,900 on his 1978 return which purportedly represented the estimated cost of the coin collection comprised mostly of old silver dollars. Petitioner asserts *467 he had collected coins "all" of his life and estimated that he had "put" over $20,000 into his collection. However, with the exception of a $400 purchase from a coin dealer in Lewiston, Maine, in December 1977, petitioner offered no details or enlightenment as to any facts he relied on in "figur[ing]" the cost of his coin collection. In 1973 petitioner took his tax materials to Guilmet Realty and was advised by an unidentified person that, if his net income was less than $1,700, he should not file a tax return. Since from his perspective *468 he did not start making money from his real estate activities until 1978, [12] petitioner failed to file income tax returns for the years 1973 through 1977. A timely return was filed for 1978. Although no application for extension was made, petitioner's 1979 return was not filed until August 29, 1980. In the February 14, 1983, statutory notice of deficiency, respondent reconstructed petitioner's income for the years in issue and determined additions to tax pursuant to sections 6651(a), 6653(a), and 6654. The parties' disagreement as to gross profit reflects the cost of renovations and repairs to improved properties sold during 1973 and 1978 discussed in detail supra.[13] *469 The 1978 itemized deduction of $8,585 in dispute is attributable to the purported coin collection loss. Additionally, the parties disagree as to whether petitioner's profits from real estate sales should be taxed at capital gain or ordinary income rates. OPINION The first issue presented for our decision is whether 35 parcels of real estate sold by petitioner during the years in issue were capital assets within the meaning of section 1221. If so, petitioner's profits on these sales are entitled to the preferential treatment afforded capital gains. Section 1202. To resolve this issue, we must look to the definition of a capital asset. Section 1221 provides, in pertinent part, that: the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * Because the capital gain provisions represent "an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly" in order "to effectuate the basic congressional purpose." Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955); *470 Commissioner v. Gillette Motor Transport, Inc.,364 U.S. 130, 134 (1960); Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 265 (1958). Petitioner bears the burden of proof to establish that the properties he sold were capital assets. Bynum v. Commissioner,46 T.C. 295, 298 (1966); Municipal Bond Corp. v. Commissioner,46 T.C. 219, 228 (1966), affd. in part and revd. in part, 382 F.2d 184 (8th Cir. 1967); Rule 142(a). Section 1221(a) requires that, to determine if petitioner's profits from the sale of real estate are entitled to capital gain treatment, three questions must be answered: (1) what was petitioner's trade or business; (2) did petitioner hold the property primarily for sale in that business; and (3) were the sales "ordinary" in the course of that business? Suburban Realty Co. v. United States,615 F.2d 171, 178 (5th Cir. 1980). As to the second question, in Malat v. Riddell,383 U.S. 569, 572 (1966), the United States Supreme Court clarified the meaning of the phrase "primarily for sale" as follows: The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the *471 realization of appreciation in value accrued over a substantial period of time" on the other. * * * A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), "primarily" means "of first importance" or "principally." [Citations omitted.] In making the requisite inquiries, all relevant facts and circumstances must be considered. Redwood Empire Sav. & Loan Asso, v. Commissioner,68 T.C. 960, 971 (1977), affd. 628 F.2d 516 (9th Cir. 1980). Before turning to the controlling questions, we note that, in cases such as this, courts frequently make separate findings as to each of a taxpayer's real estate transactions rather than reaching a general conclusion as to the taxpayer's status as a dealer or investor on all sales. Municipal Bond Corp. v. Commissioner,382 F.2d 184, 186 (8th Cir. 1967). [14] Such an approach to individual transactions may be necessary because a taxpayer active in the real estate business, such as petitioner, may hold real estate as an investment. Eline Realty Co. v. Commissioner,35 T.C. 1, 5 (1960); Mieg v. Commissioner,32 T.C. 1314, 1321 (1959). In the instant case, however, neither party has focused on the *472 individual properties to an extent which would permit a property-by-property analysis. Further, the record does not indicate that petitioner's intent or purpose in acquiring, holding, or selling differed by property. Although certain parcels of property were held for relatively long periods of time, the record does not indicate whether these holding periods were due to difficulty in finding an acceptable buyer, the time required for extensive renovations and repairs, or some other undisclosed reason. Relevant factors considered in determining whether property is held primarily for sale to customers in the ordinary course of business include: (1) the frequency, continuity, and substantiality of sales; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the time and effort the taxpayer habitually devoted to the sales; (4) the extent of improvements and advertising to increase sales; and (5) the nature and purpose of the acquisition of the property and the duration of ownership. [15]United States v. Winthrop,417 F.2d 905, 909-910 (5th Cir. 1969); *473 Biedenharn Realty Co. v. United States,526 F.2d 409, 415 (5th Cir. 1976); Daugherty v. Commissioner,78 T.C. 623, 629 (1982); Adam v. Commissioner,60 T.C. 996, 999 (1973). No one or combination of the above factors is determinative.
The frequency, continuity, and substantiality of real estate sales by petitioner during the years in issue is a strong indicator that petitioner was in the business of buying and selling real estate and held the property sold primarily for sale to customers in the course of that business. Suburban Realty Company v. United States,supra at 178; Biedenharn Realty Company, Inc. v. United States,supra at 416. Petitioner, without citing any authority or precedent, argues that the frequency of his sales was less than a dealer's. We disagree. During the years 1973 through 1979, petitioner made 39 real estate *474 sales--an average of between five and six sales per year. In the peak sales year, 1974, petitioner made 11 such sales. Sales of comparable frequency have been found to be dealer, rather than investor, sales. [16] Petitioner's real estate sales evidence a continuous, and relatively consistent, pattern of business activity during the years 1969 through 1979. Such sales were substantial--totaling $335,310 and representing $161,856 profits. During the years in issue, petitioner's real estate activities were, effectively, his only source of income. The extensive solicitation and advertising efforts undertaken by petitioner, as well as his dedication of time and energy to his real estate pursuits, also supports a conclusion that his real estate holdings were not capital assets. He obtained a broker's license to facilitate his real estate endeavors, negotiated all aspects of his real estate purchases and sales and, *475 from 1973 through 1979, personally made approximately 90 percent of these sales. He advertised extensively and purchased a helicopter specifically to facilitate sales to out-of-state buyers. From 1969 through at least 1979, petitioner's sole occupation was his real estate business. The improvements, renovations and/or repairs petitioner generally made to each property he purchased further indicate that petitioner's properties were not capital assets. He expended significant time, effort, and money on these improvements, renovations and/or repairs for the explicit purpose of enhancing his properties' salability. In seeking preferential treatment of his profits on real estate sales, petitioner argues that his intent in acquiring the properties was that of an investor. In support of this contention, petitioner cites the fact that he generally held the property in excess of the statutorily required holding period. [17] Merely holding property for a prescribed period of time does not act as a talisman to insulate profit on subsequent sale of the property from taxation as ordinary income. [18] The duration of ownership is but one of the relevant facts and circumstances which must be considered. *476 Petitioner further argues that in acquiring real estate his intent was to generate income from rents and a stream of income from installment sales. The record does not support this argument.The vast majority of petitioner's real estate acquisitions were of unimproved land and the record does not indicate such property ever generated any rental income or that petitioner made any efforts to rent his unimproved property. Further, petitioner's rental income was insignificant in relation to his profit from the sale of property.[19] Although some of the improved properties sold by petitioner during the years in issue generated rent at some period, this was generally incidental and occurred during the period petitioner was renovating the building for sale or searching for a viable buyer. Incidental rental income does not convert property held as a dealer into property held *477 for investment. See Municipal Bond Corp. v. Commissioner,46 T.C. 219 (1966), affd. in part and revd. in part 382 F.2d 184 (8th Cir. 1967). [20] Petitioner made no effort to build an inventory of rental property. In fact, by 1979, he had sold all of his improved property and, thereafter, had no rental income. The evidence also does not support petitioner's contention that one of his primary purposes in his real estate activities was to generate a stream of income from installment sales. Although petitioner frequently provided financing to his buyers, he preferred, and sought, cash buyers. The majority of his sales were completed rather than installment sales and were, therefore, contra to this stated objective. As to the third question in our analysis, whether the sales were in the ordinary course of petitioner's business, we agree with respondent that *478 the sales in issue were not only ordinary but "the sole object" of petitioner's business. In assessing whether said sales were "ordinary" the inquiry is whether such sales activities were "usual or a departure from the norm." United States v. Winthrop,supra at 912. The history and chronology of petitioner's real estate sales demonstrate that the sales were usual. Such sales continued over a number of years. In Suburban Realty Company v. United States,615 F.2d 171, 178 (5th Cir. 1980), the frequency and substantiality of sales was cited as the key factor in determining the "ordinariness" of property sales. This factor was discussed supra and supports our conclusion that petitioner's sales were in the ordinary course of his real estate business. Additional factors supporting this conclusion are that the sales and advertising were handled directly by petitioner and that the real estate sales activities were petitioner's only business during the years in issue. Based on the entire record, we conclude that petitioner held each of the properties sold during the years in issue primarily for sale to customers in the ordinary course of his real estate business. Therefore, profits from *479 such sales are taxed as ordinary income. The next issue we address is petitioner's assertion that gross profits from realty sales in the years 1973 and 1978 are overstated because respondent failed to consider the costs of major renovations and repairs made to certain improved properties. Petitioner bears the burden of proof with regard to these adjustments. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Documentary substantiation of the costs in issue was lost when petitioner's home was burglarized in 1978. Respondent concedes that there is no doubt that certain improvements may have been made but asserts that petitioner's uncorroborated and self-serving testimony is insufficient to justify any adjustment. We disagree. We note that petitioner undertook to represent himself. Hence, during trial, the Court sought to elicit from him details concerning the specific repairs undertaken on each piece of property and the cost of said repairs. Although petitioner's memory was impaired due to a head injury, his testimony as to these costs was entirely credible. He provided sufficient details as to the specific renovations and repairs as to each piece of property, and realistic *480 approximations of their costs, to warrant allowance of adjustments in 1973 and 1978. While imprecision exists, relying on Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930), we have found above that petitioner expended $3,000 for repairs of property sold in 1973 and $23,000 for renovations and repairs of properties sold during 1978 which respondent failed to take into account. Petitioner's profits from real estate sales during said years should, therefore, be decreased to reflect these costs. We next address the issue of petitioner's claimed theft loss deduction. Under section 165, an individual may deduct losses resulting from theft of property to the extent the loss exceeds $100 and is not compensated by insurance or otherwise. The amount of the deduction is the lesser of (1) the fair market value of the property immediately before the loss reduced by its fair market value immediately after the loss, or (2) the adjusted basis of the stolen property. Sections 1.165-7(b)(1) and 1.165-8(c), Income Tax Regs. In the instant case, the basis of the property is its cost. Section 1012. Although other items were stolen, the theft loss deduction in issue is attributable solely *481 to petitioner's coin collection. Respondent argues that petitioner is not entitled to this deduction as he has failed to establish: (1) that he did, in fact, own a coin collection; (2) the alleged purchase price of the collection; (3) the fair market value of the collection on January 10, 1978, (the date of the purported theft); and (4) that a theft, in fact, took place. Petitioner must prove that a theft occurred and that he was the owner of the property stolen. Elliott v. Commissioner,40 T.C. 304, 311 (1963); Draper v. Commissioner,15 T.C. 135 (1950). We accept petitioner's testimony, which is corroborated in part by the Sheriff's Office Complaint Report and the insurance reimbursement, that his home was burglarized in 1978 and certain coins he owned were among the items stolen. In order to establish his entitlement to the claimed deduction, however, petitioner must also prove the amount of the loss. Pfalzgraf v. Commissioner,67 T.C. 784, 787 (1977). With the limited exception of his $400 coin purchase in late 1977, petitioner failed to provide details or any credible evidence of either the value or cost of the stolen coins. His conclusory testimony is inadequate to fill this *482 evidentiary gap. In this regard, we not that petitioner failed to insure his coin collection which he valued at $20,000, failed to mention any coin collection on his insurance loss claim, and initially claimed that the total loss suffered as a result of the burglary was only $15,357. Petitioner would have the Court believe that he owned and, in fact, annually added to, a valuable coin collection during years when he was forced to borrow money from his family to live on and to purchase real estate. We decline to do so. As petitioner has failed to prove that the value of the coins stolen in 1978 exceeded $400, we hold that his unreimbursed theft loss in 1978 was $400. [21]
Having resolved the substantive issues in dispute, we now address the additions to tax. [22] On brief petitioner failed to address the individual additions to tax determined by respondent stating in a conclusory fashion that "penalties of $5,552 which under the circumstances are *483 excessive," should be disallowed in their entirety. Section 6651(a) imposes an addition to tax for failure to file a timely return unless it is shown that such failure is due to reasonable cause and not willful neglect. Petitioner has the burden of showing *484 reasonable cause for an untimely filing. Rule 142(a); BJR Corp. v. Commissioner,67 T.C. 111, 130-131 (1976); Elliott v. Commissioner,supra at 315. Petitioner failed to file any returns for the years 1973 through 1977 and failed to timely file his return for 1979. He argues that his failure to file returns in the years 1973 through 1977 was the result of advice he received from an unidentified person he consulted in 1973. Such erroneous advice does not constitute reasonable cause for his failure to comply with the statutory requirements. Even a good faith belief that one is not required to file a return does not constitute cause under section 6651(a)(1) unless bolstered by advice of a competent tax adviser who has been fully informed of all of the relevant facts. Stevens Bros. Foundation, Inc. v. Commissioner,39 T.C. 93, 133 (1962), affd. in part and revd. in part, 324 F.2d 633 (8th Cir. 1963). [23] *485 See also United States v. Boyle,469 U.S.    , 105 S.Ct. 687 (1985). Petitioner offered no explanation for his failure to timely file a return for 1979. In view of the foregoing, we sustain respondent's determination of additions to tax pursuant to section 6651(a)(1). Section 6653(a) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proving respondent's determination erroneous. Rule 142(a); Bixby v. Commissioner,58 T.C. 757 (1972). Petitioner's failure to exercise due care in filing timely returns also gave rise to his failure to pay income taxes in the years 1973, 1974, 1976, 1977 and 1979. As to all years in issue, petitioner failed to present any evidence that his failure to pay or underpayment of tax was not due to negligence or an intentional disregard of rules and regulations. Consequently, he is liable for the additions to tax pursuant to section 6653(a) as determined by respondent. Section 6654 imposes an addition to tax for any underpayment of estimated tax by an individual unless certain exceptions, none of which exists in the instant case, are applicable. The Court has held this addition to be mandatory if the tax has, in fact, been underpaid. The existence of extenuating circumstances is irrelevant. Mitchell v. Commissioner,51 T.C. 641, 648 (1969), revd. 430 F.2d 1 (5th Cir. 1970), *486 revd. 403 U.S. 190 (1971); Estate of Ruben v. Commissioner,33 T.C. 1071, 1972 (1960). Since there was in fact no payment, petitioner is liable for additions to tax pursuant to section 6654 as determined by respondent. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner's holding period was less than the statutory holding period as to three pieces of property accounting for profits of $1,850 in 1973 and $2,476 in 1974. As to these sales, petitioner would not be entitled to long-term capital gain treatment under any scenario.↩
3. As used in this opinion the term "improved" property refers to property on which a building existed at the time of purchase and sale. ↩
4. Documentary substantiation of the costs of renovations and repairs during 1973 and 1978 was lost when petitioner's home was burglarized in 1978. Additional difficulties in reconstructing the precise costs of these renovations and repairs were due to petitioner's impaired memory as a result of a head injury suffered in an accident a few years before trial.↩
5. Although 1975 is not a year before the Court, this year forms part of the pattern of petitioner's real estate activities and is included in our findings as relevant to our determination of the issues before us.
6. Adjustments to the amount of gains stipulated by the parties have been made to reflect the costs of repairs and renovations on certain improved properties sold in 1973 and 1978 discussed supra.↩
7. The record is silent as to petitioner's real estate activities for the years 1980 and thereafter. As of trial on May 3, 1984, petitioner owned five parcels of real estate which he was in the process of selling. ↩
8. These figures differ from those stipulated by the parties due to the fact that the stipulation failed to reflect the details of the 1979 completed sale and certain 1973 and 1978 renovation and repair costs (see n. 6).↩
9. Includes principal payments on installment sales in prior years.
10. The Complaint Report of the investigating officer, based on statements of the caretaker, lists additional contents of the safe as bonds (worth approximately $8,000), around $3,000 in cash, an unknown amount of jewelry and real estate papers. The accuracy of this report, and the caretaker's account, is questionable as the purportedly stolen bonds, cash, and jewelry were never mentioned during trial or, apparently, to petitioner's insurance company. ↩
11. Petitioner's vague explanation of why the claimed loss was less than the value he placed on his coin collection at trial, i.e., that he claimed a lesser amount to avoid any challenge, was, at best, contrived.↩
12. From 1973 through 1977, petitioner borrowed money "to live on" from his parents, although during at least some of these years he made numerous real estate purchases.↩
13. Notwithstanding the fact that petitioner stipulated to the accuracy of the 1973 adjustment, the parties' dispute as to this item was fully tried and briefed by respondent. We, therefore, deem the stipulation corrected in this regard and the adjustment for 1973 properly before the Court.
14. See also, Estate of Dean v. Commissioner,T.C. Memo. 1975-137; Wilson & Fields v. Commissioner,T.C. Memo. 1962-200↩.
15. Other factors frequently considered which are not relevant to our decision in this case are: (1) the extent of subdividing and development to increase sales; (2) the use of a business office for the sale of the property, and; (3) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property.↩
16. See Urick v. Commissioner,T.C. Memo. 1983-60 (30 lots sold over 11 years); Enslin v. Commissioner,T.C. Memo. 1982-430 (an average of 8 sales per year); Maginnis v. Commissioner,T.C. Memo. 1955-250↩ (37 sales over 7 years with a maximum of 7 sales in each of 2 peak years).
17. The applicable holding period for long-term capital gain treatment prescribed in section 1222(3), was 6 months for years prior to 1977, 9 months for 1977, and 1 year for 1978 and 1979.↩
18. E.g., Urick v. Commissioner,supra (lots held over 10 years); Herndon v. Commissioner,T.C. Memo. 1968-135↩ (lots held over 20 years).
19. We note in this regard that it is impossible to determine from the record whether the rental income stipulated by the parties is attributable solely to the property sold during the years in issue. ↩
20. See also, Vidican v. Commissioner,T.C. Memo. 1969-207; Maginnis v. Commissioner,supra;Goodman v. Commissioner,T.C. Memo. 1954-43↩.
21. The record is silent as to the fair market value of these coins on the date of the theft. However, as the coins were purchased approximately 1 month before the theft, we find that their fair market value when stolen was not less than cost.↩
22. On brief, petitioner argued that the rental income calculated by respondent was incorrect and that certain amounts designated rental income were sales procees. He further asserts that "the Court did consider Mr. Norris' claims to this and did make adjustments accordingly." In fact, petitioner stipulated to the accuracy of respondent's calculation of rental income and, after a rather confusing interchange with the Court, appeared to concede that the stipulated amounts were accurate. Contrary to petitioner's statement, no adjustments in these amounts were made by the Court. Similarly, the Petition raises as an issue the business expense deductions allowed by respondent for 1978 and 1979. However, petitioner conceded that respondent had taken into account all expenses he could substantiate and, therefore, he was "not making an issue of additional expenses." As petitioner effectively conceded both issues, we need not address them.↩
23. See also, Vinz v. Commissioner,T.C. Memo. 1984-84; Hoffman v. Commissioner,T.C. Memo. 1982-380↩.